246 N.J. Super. 236 (1991)
587 A.2d 285
JOHN BONDI, PLAINTIFF-APPELLANT,
v.
SAMUEL B. POLE, M.D. AND FOUAD K. MICHAIL, M.D., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 15, 1991.
Decided February 25, 1991.
*237 Before Judges BRODY and GRUCCIO.
Robin G. Marks argued the cause for appellant (Francis J. Hartman, attorney; Robin G. Marks, on the brief).
Karen A. Kingsley argued the cause for respondent Samuel B. Pole, M.D. (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys; Karen A. Kingsley, on the brief).
Edwin R. Jonas, III, argued the cause for respondent Fouad K. Michail, M.D.
The opinion of the court was delivered by BRODY, J.A.D.
Plaintiff appeals from a judgment of involuntary dismissal with prejudice entered after he had completed the presentation of evidence at trial. R. 4:37-2(b). He alleges that defendants, who are ophthalmologists, negligently failed to order X-rays that would have revealed the broken-off point of a ballpoint pen that had lodged in his maxillary sinus causing pain and suffering during the twelve years that it remained undetected. The dismissal was based on plaintiff's inability to present a prima facie case after the trial judge had granted defendants' motion to strike the testimony of plaintiff's only expert witness, Dr. Irving Berny. We now reverse.
Plaintiff testified that in 1971 he was a police officer stationed at a high school where there had been outbreaks of violence. While on this assignment he was assaulted by a *238 group of students. One of them stabbed him just below the left eye with a ballpoint pen, which was left protruding from his face. Fearing that the pen would do further harm if struck during the continuing assault, plaintiff tried to pull it out while continuing to defend himself. The pen held fast until plaintiff was finally able to pull it out with both hands. Unknown to plaintiff, the point of the pen had broken off and remained in his head.
Defendant Samuel Pole treated plaintiff soon after the incident. He sutured the wound without taking X-rays. Ten years later, after the pain and discomfort caused by the pen point had become more frequent and intense, plaintiff consulted defendant Fouad Michail, who also did not take X-rays. However, Dr. Michail referred plaintiff to the Wills Eye Hospital for an ultra-sound examination. This examination did not detect the pen point. In 1983 plaintiff was suffering from unrelated dental problems that required extensive X-rays. Those X-rays revealed the pen point. Plaintiff experienced immediate relief after the point was surgically removed.
The trial recessed for the day, after plaintiff's expert had completed his testimony. The next day, after plaintiff had rested, defendants moved to strike Dr. Berny's testimony on the ground that "[t]here was never an opinion on the issue of deviation from accepted standards of medical practice which places within the language of deviation from accepted standards of medical practice within a reasonable degree of medical certainty." The trial judge accepted defendants' argument that for plaintiff to present a prima facie case Dr. Berny must expressly testify that he held his opinion of deviation "within a reasonable degree of medical certainty." The judge permitted plaintiff to recall Dr. Berny to supply the "missing" testimony.
After Dr. Berny returned to the courtroom, he resumed the witness stand and answered the following questions put to him by plaintiff's attorney:

*239 Q. Dr. Berny, when you were here yesterday I omitted to ask you a question which I want to put to you today.
You expressed an opinion, a number of opinions yesterday but particularly one about the failure of Doctors Pole and Michail to have X-rays done and said that that was a deviation from the standard of care. Do you recall that?
A. Yes, I do.
Q. Now, my question to you, Doctor, when you expressed those opinions including that specific one did you hold that opinion to a reasonable degree of medical probability?
A. Yes, I did.
That did not end the matter. On cross-examination, defense counsel asked Dr. Berny to define "a reasonable degree of medical probability." He was not able to do so to the satisfaction of the trial judge. His efforts were as follows:
Q. Doctor, can you tell us what it means to a reasonable degree of medical probability?
A. Well, I'd have to give you definition of reasonable, good common sense, or normalcy, that's what the word reasonable means to me.
Within the action of a normal individual with good common sense and proper wits.
* * * * * * * *
Q. Doctor, when you used the word probability what do you understand probability to mean?
A. It's probable and reasonable and normalcy. Normal behavior for an individual to act in that manner.
Q. Doctor, do you distinguish between certainty and probability?
A. Yes, there is a difference.
Q. Do you distinguish between possibility and probability?
A. Yes, I do.
Q. Now, doctor, when we talk about medical probability what does that mean to you as opposed to any other kind of probability?
A. Within the realm of common sense and normalcy.
Q. Is that for doctors or is that for everybody else?
A. For doctors particularly. I'm relating to doctors.
The trial judge suppressed Dr. Berny's testimony, holding that the doctor did not define reasonable probability in terms of "a certain amount of certainty or certitude, more likely than not that this is the way it is."
We agree that Dr. Berny did not give a satisfactory definition of the legal concept of reasonable medical probability. However, the exercise was unwarranted because Dr. Berny was *240 not required to state in his testimony that there was a deviation from professional standards to a "reasonable medical probability." The trial judge confused the foundation required for expressing an opinion that there was a deviation with the foundation required for expressing an opinion that the deviation caused the patient's injuries.
This distinction is found in Germann v. Matriss, 55 N.J. 193, 208, 260 A.2d 825 (1970), where the defendant was a dentist:
The law does not make a dentist a guarantor that no harm or unfavorable consequence will arise from his treatment. The obligation assumed by him is to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field....
The foundation for an expert witness's opinion that there was a deviation is that the deviation was from an accepted medical standard and not simply from the expert's personal standard. The foundation for an expert witness's opinion that the deviation caused the patient's injuries, however, is that the causal connection is a reasonable medical probability:
... A plaintiff who charges a deviation from such standard of skill or care must assume the burden of establishing facts showing not only the deviation but also a fact equally essential to the recovery of damages, i.e., that the deviation was the reasonably probable cause of the injurious condition arising thereafter. If the proof adduced at trial simply shows a number of causes, only one of which could be charged to the dentist's lack of due care, for the presence of the factor which eventuated in injury the issue of the dentist's responsibility cannot be submitted to the jury for determination. To do so would be to authorize a decision on the basis of conjecture or speculation. It is only when there are circumstances present from which a reasonable man could find that the dentist's want of due care was more likely the probable cause that the issue of liability must go to the jury for determination. [Ibid.]
Dr. Berny expressed his view of defendants' negligence adequately in terms of deviations from accepted medical standards. We are not concerned in this appeal with the sometimes difficult question of whether there is a reasonable medical probability that a doctor's malpractice caused the patient's injuries.
Reversed and remanded for a new trial.