157 F.3d 680
 47 ERC 1225, 28 Envtl. L. Rep. 20,001,
98 Cal. Daily Op. Serv. 7209
 ALASKA CENTER FOR THE ENVIRONMENT; Anchorage Audubon
Society; National Audubon Society; National
Wildlife Federation; Sierra Club;
Wildlife Federation of Alaska,
Plaintiffs-Appellants,
v.
Togo D. WEST, Jr., Secretary of the U.S. Department of the
Army; Arthur E. Williams, Lt. General, Commander,
Engineer; United States Army Corps of
Engineers, Defendants-Appellees.
 No. 96-36190.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 15, 1998.
Decided Sept. 16, 1998.
 
 Anthony N. Turrini, National Wildlife Federation, Anchorage, AK, for plaintiffs-appellants.
 John T. Stahr, United States Department of Justice, Washington, DC, for defendants-appellees.
 Appeal from the United States District Court for the District of Alaska; John W. Sedwick, District Judge, Presiding. D.C. No. CV-95-00229-JWS
 Before: FARRIS, O'SCANNLAIN, and HAWKINS, Circuit Judges.
 FARRIS, Circuit Judge.
 
 
 1
 Alaska Center for the Environment appeals the district court's order granting summary judgment to the Army Corps of Engineers under the Clean Water Act, 33 U.S.C. § 1251 et seq. Alaska Center argues that the Corps violated the CWA by wrongfully issuing five general permits for construction on wetlands in Anchorage. We affirm.
 
 I. BACKGROUND
 
 2
 In 1994, the Corps announced that it would issue five general permits authorizing the filling of certain wetlands specified in the Anchorage Wetlands Management Plan. The permits allow specific discharges for five different categories of activities: GP 93-10 applies to residential fill pads, including site preparation and driveways; GP 93-11 applies to roads and other linear development; GP 93-12 applies to commercial, institutional, and community development; GP 93-13 applies to industrial developments; and GP 93-14 applies to wetlands, habitat, and water quality enhancement projects.
 
 
 3
 The five-year general permits expire in late 1999 and potentially implicate 2,142 acres of wetlands. Based on analysis of prior years and the initial year of the present permits, however, the Corps concluded that only 360 acres would likely be affected.
 
 
 4
 Alaska Center filed suit in 1995 seeking an injunction against development under the general permits. Following an initial remand to allow the Corps to reissue the permits with modifications, the district court granted summary judgment against Alaska Center.
 
 
 5
 Alaska Center challenges both the Corps' finding that the general permits authorize activities that are "similar in nature" and that the general permits authorize activities that have "minimal" individual and cumulative adverse environmental effects. Alaska Center also contends that the Corps illegally delegated regulatory authority under § 404 of the CWA to the Municipality of Anchorage.
 
 II. DISCUSSION
 
 6
 We review de novo the district court's grant of summary judgment. See Quevedo v. Trans-Pacific Shipping, Inc., 143 F.3d 1255, 1257-58 (9th Cir.1998). An agency decision should be set aside only if arbitrary and capricious. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Review under the standard, though narrow, must be searching and careful. See Id. at 378, 109 S.Ct. 1851. The court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. See Id.
 
 
 7
 The Clean Water Act is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the statute, the discharge of pollutants into navigable waters is unlawful unless authorized by permit. The term "pollutants" includes dredge or fill material. 33 U.S.C. § 1362(6). The term "navigable waters" includes wetlands. 33 U.S.C. § 1362(7); United States v. Pozsgai, 999 F.2d 719, 727 (3d Cir.1993).
 
 
 8
 The Corps may issue individual or general permits for the discharge of dredge or fill materials into wetlands. See 33 U.S.C. § 1344. This permit process is governed simultaneously by Corps Regulations, 33 C.F.R. §§ 320-29, and by EPA guidelines, 40 C.F.R. §§ 230.1-230.7.
 
 
 9
 Individual permits for discharges issue only after notice, public hearings, and a case-by-case evaluation of a specific project. See 33 C.F.R. § 323.3(g); 33 U.S.C. § 1344(a). General permits, on the other hand, do not require the same site-specific analysis. Instead, they require a two-part inquiry into the similarity of the projects and their environmental effects. As stated by the statute, general permits may issue on a state, regional, or nationwide basis
 
 
 10
 for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.
 
 
 11
 33 U.S.C. § 1344(e)(1)(emphasis added). The guidelines implementing this section provide that:
 
 
 12
 A General Permit for a category of activities involving the discharge of dredged or fill material complies with the Guidelines if it meets the applicable restrictions on the discharge in § 230.10 and if the permitting authority determines that:
 
 
 13
 (1) The activities in such category are similar in nature and similar in their impact upon water quality and the aquatic environment;
 
 
 14
 (2) The activities in such category will have only minimal adverse effects when performed separately; and
 
 
 15
 (3) The activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment.
 
 
 16
 40 C.F.R. § 230.7(a).
 
 
 17
 Thus, the general permits allow the Corps to circumvent the process of specific approval "where numerous applications for similar activities are likely...." 40 C.F.R. § 230.6(a). General permits may issue for only five years, and the Corps has the authority to revoke them if it determines that the environmental impact is more than minimal or that individual permits should be used. See 33 U.S.C. § 1344(e)(2).
 
 
 18
 A project falling within the category of a general permit may proceed without further authorization if it meets specified conditions. 33 C.F.R. § 325.2(e)(2). The Corps also retains discretionary authority to require that any project proceed through the individual permitting process. 33 C.F.R. § 325.2(e)(2).
 
 A. SIMILAR IN NATURE
 
 19
 Prior to issuing a general permit, the Corps must publish an evaluation including a "precise description of the activities to be permitted ... explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single General permit...." 40 C.F.R. § 230.7(b)(2). Alaska Center argues that the Corps failed to meet the separate "similar in nature" requirement because it considered only the minimal environmental effects of the activities under the permits.
 
 
 20
 Undoubtedly, the Corps placed great weight on ensuring that the activities allowed would each have a similar minimal effect on the environment. The Corps emphasized that "[t]he proposed GP's are designed so that secondary impacts that might differentiate the activities proposed for authorization have been reduced such that environmental impacts would not now differ among the GPs." Despite the apparent argument to the contrary, such considerations do not constitute arbitrary and capricious action. The regulations explicitly require the Corps to consider and explain why actions are "similar ... in environmental impact." 40 C.F.R. § 230.7(b). The conditions satisfy this requirement.
 
 
 21
 The general conditions in the permits include buffer zones to protect adjacent wetlands and waterbodies of higher environmental value; limits on the type of discharge materials; and a requirement that the applicant receive an initial opinion of compliance from the municipality. The special conditions, which make up the bulk of the permit document, provide further limitations which narrow application of the permits to a substantial degree. A brief review of various individual permits establishes this tailoring.
 
 
 22
 -Permit 93-10 applies only to residential buildings. It does not allow any structure over 50 feet in height. Driveways are restricted to a maximum of 40 feet width and a length of 200 feet.
 
 
 23
 -Permit 93-11 is limited to residential streets, alleys and collector streets no more than 75 feet in width. It also limits its application to linear development for items such as utility lines. Larger roads and non-linear development are excluded.
 
 
 24
 -Permit 93-12 is limited to those businesses listed in the Anchorage Municipal Code Title 21.35.020, and public and private institutions. The permit prohibits underground storage tanks; air pollutant sources other than normal heating and power; and anything above incidental use of hazardous substances for cleaning and maintenance.
 
 
 25
 -Permit 93-13 applies only to industrial development whose fundamental purpose is the assembly, storage, and/or distribution of products constructed of inert materials. Activities in the open are limited to those connected with marshalling yards for storage and distribution of industrial products. Pursuant to the general conditions, the permit does not authorize natural resource processing, gravel mining, dry cleaning operations, battery transfer yards, auto repair garages, and other items.
 
 
 26
 The question thus turns to whether the Corps could use the same types of conditions to satisfy the remaining "similar in nature" requirement of the regulations. There is no disagreement that the permits authorize a broad range of potential activities. For example, Permit 93-10 may be used for such items as single-family dwellings, two-family dwellings, row-houses, rooming homes, and other residential structures. See Anchorage Municipal Code Title 21.40. The parties' dispute centers on a single issue: whether the Corps may issue a general permit to include such a range of activities it considers similar in nature, or whether the permit may only authorize a narrowly defined activity.
 
 
 27
 The term "similar in nature" is undefined in the statute. In interpreting the statute, the Corps' construction "is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).
 
 
 28
 Although phrased as such by Alaska Center, there is no argument that the regulations themselves are unreasonable or conflict with the intent of Congress. Instead, Alaska Center's argument challenges the Corps' interpretation of the implementing regulations. Alaska Center maintains that the regulations require a thorough public interest review prior to the issuance of a general permit. According to Alaska Center, the permits' authorization of a broad range of activities precluded the Corps from making any particularized finding that a proposed activity would benefit the public interest more than it caused detriments.
 
 
 29
 As with its interpretation of the statute, the court generally gives deference to the Corps' interpretation of its own regulations. See Pyramid Lake Paiute Tribe v. Hodel, 882 F.2d 364, 369 (9th Cir.1989). The Corps' interpretation is controlling unless plainly erroneous or inconsistent with the regulations. See Id.
 
 
 30
 We cannot conclude that the Corps' interpretation is either plainly erroneous or inconsistent with the regulations. The conditions stated above illustrate not only similarity of environmental effects, but also similarity in the nature of the projects. While it may be true that the regulations do not specifically distinguish between such structures as "single-family housing" and "two-family dwellings," we are not persuaded that the general permitting process must necessarily require such fine distinctions. In terms of permitting for commercial uses, such distinctions would appear to blur the line between specific and general permits, rendering general permits virtually unavailable for commercial development. This may be a desirable result. However, such speculation does not lead to a finding that the Corps' decision was plainly erroneous.
 
 
 31
 We also reject Alaska Center's argument that the Corps cannot make a sufficient public-interest analysis when its general permits allow a range of similarly confined activities. Such a result is belied by the record. The record reflects that the Corps did consider public interest in authorizing the activities. The permit evaluation shows that the Corps wished to provide predictability for property owners and reduce wetland processing time while simultaneously protecting higher value wetlands. Other portions of the evaluation list more specific considerations. For example, the evaluation notes the Corps' consideration of such human-use characteristics as benefits to the local economy, impacts on traffic, and community cohesion. These considerations were clearly guided by the voluminous restrictions placed on the general permits.
 
 
 32
 The Corps did not act arbitrarily and capriciously in using the restrictions to satisfy the "similar in nature" requirement. The Corps made a reasonable determination that it should consider the public interest in general types of activities and guaranteed that where the activities did differ, those differences would have a similar impact.
 
 B. MINIMAL IMPACTS
 
 33
 Alaska Center also maintains that the Corps acted arbitrarily and capriciously by concluding that the discharges would have a minimal environmental impact. Alaska Center contends that the likely filling of 360 acres of wetlands and potential filling of over 2000 acres would harm the environment and would also break up the wetlands as a cohesive ecological unit. This is supported by letters from the EPA and studies by the Fish and Wildlife Service.
 
 
 34
 The permitting process took into account the Anchorage Wetlands Management Plan. This plan was generated by the Municipality in conjunction with federal and state resource agencies. Under the plan, four wetland functions are evaluated: Hydrology, Habitat, Species Occurrence, and Social Function. The evaluation of these categories involves factors addressing a broad range of wetland functions.
 
 
 35
 The Anchorage Wetlands Management Plan scored wetlands individually. Those wetlands with a high score were designated "A wetlands." Sites with moderate scores received a "B wetland" designation. These included areas with a mixture of high and low value wetlands. Finally, the plan designates certain "C wetlands"--those in which wetland functions were not significant and were more often minimal.
 
 
 36
 Although the Corps relied to some extent on the Anchorage plan, it also conducted its own analysis. The record shows that the Corps recognized that the plan graded wetlands on a large-scale basis. Thus, where the sites included an area of mixed "C wetlands" and higher value wetlands, the Corps used the higher scores for purposes of creating site-specific limitations to minimize overall impacts. After visiting the sites, the Corps determined that certain higher values could be protected by limitations such as setbacks for development. According to the Corps, most of the "C wetlands" functions had already been compromised. Overall, the Corps made efforts to designate only certain sites for development where higher value wetlands could be protected.
 
 
 37
 Given this process, the Corps' actions were not arbitrary and capricious. The record does not support Alaska Center's allegations that the Corps simply designated whole classes of wetlands as unworthy of protection. Nor is there any allegation that the Corps ignored the reports from other agencies. It did not. Instead, the Corps considered the relevant factors and came to an opposite conclusion. Although Alaska Center disagrees with the Corps' methodology and conclusions, such disagreement does not render the decision arbitrary and capricious. Marsh, 490 U.S. at 378, 109 S.Ct. 1851 (1989).[1]
 
 C. IMPROPER DELEGATION OF AUTHORITY
 
 38
 Finally, Alaska Center claims that the Corps improperly delegated authority to the Municipality to administer the permits. Alaska Center argues that because the scope of the general permits made it impossible to predict all environmental effects, the Corps improperly established a set of subjective conditions to be considered by the Municipality. Assiniboine and Sioux Tribes v. Bd. of Oil and Gas Conservation, 792 F.2d 782, 795-96 (9th Cir.1986).
 
 
 39
 The permits call for some Municipality involvement. Special condition 3 requires that before an individual may utilize any of the permits, he or she must first obtain an "opinion of compliance" from the Municipality. Upon application, the Municipality determines whether the proposed discharge affects a "C wetland" and meets the conditions in the permits. The special condition also allows the Municipality to impose additional conditions on a proposed project as long as the condition does "not conflict with or reduce the requirements" of the permits. In addition, permits 93-11 through 93-13 also require pre-construction notification to the Corps prior to certain projects.
 
 
 40
 Once an applicant receives the opinion of compliance, no further action by the Corps is necessary to begin a project. The Municipality is expected to confer with the Corps on borderline proposals and shall give quarterly reports of all activities under the permits.
 
 
 41
 Review of the law and the record illustrates that there was no impermissible delegation, only an attempt to coordinate activity. Once a permit is validly issued, a project complying with its terms does not require any further action by the Corps. 33 C.F.R. § 325.2(e)(2). As noted by the Corps, the provision for review by the Municipality could be eliminated altogether. Consistent with the language of the permits, the provision simply provides for additional, consistent protections by the Municipality. And the process does nothing to eliminate the ultimate responsibility of the Corps to ensure compliance. As stated in the amended permit document, the "opinion of compliance is not legally binding...." Instead, applicants proceed at their own risk. The Corps "retains its full legal authority and may suspend use of or find a violation of the [permits] at any time ... even if the Municipality has issued an 'opinion of compliance.' " The Corps did not unlawfully delegate authority.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 The district court limited its analysis to the potential impact of the 360 acres likely to be filled. It is unclear whether Alaska Center challenges this decision as a matter of law. Instead, Alaska Center asserts that filling of even 360 acres would cause more than a minimal cumulative impact. Limiting our analysis to the 360 acre figure, we disagree
 To the extent Alaska Center argues that we must consider all 2,142 acres of wetlands potentially affected, an argument not supported with authority in its brief, we reject the contention. We note that Corps regulations provide that "[t]o predict cumulative effects, the evaluation shall include the number of activities likely to be regulated under a General permit...." 40 C.F.R. § 230.7(b)(3). The Corps followed this regulation by adopting a finding which excluded those acres unlikely to be filled from its analysis of minimal impact. The Corps' actions were reasonable. In fact, it appears that any proper assessment of impact should automatically take into account the area likely to be affected.