**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0307-23

THE ESTATE OF MACKENZIE
JENNINGS, by its administratrix,
MICHELLE JENNINGS,

     Plaintiff-Appellant,

v.

DIANA VITALE, M.D., ASHLEY
PAPAPETROU, D.O., VITALE
WOMEN'S HEALTH OBSTETRICS
AND GYNECOLOGY, LLC,
ST. JOSEPH'S REGIONAL
MEDICAL CENTER,

     Defendants-Respondents,

and

PETER BALAZS, M.D.,

     Defendant.

_____

Argued December 18, 2024 – Decided March 12, 2025

Before Judges Marczyk and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0812-18.

Joseph M. Cerra argued the cause for appellant (Lynch Law Firm, PC, attorneys; Joseph M. Cerra, on the briefs).

Ryan A. Notarangelo argued the cause for respondents Diana Vitale, M.D. and Vitale Women's Health Obstetrics and Gynecology (Dughi, Hewit & Domalewski, attorneys; Rachel M. Schwartz, of counsel and on the brief; Ryan A. Notarangelo, on the brief).

Beth A. Hardy argued the cause for respondents St. Joseph's Regional Medical Center and Ashley Papapetrou, D.O. (Farkas & Donohue, LLC, attorneys; Evelyn C. Farkas, of counsel; Beth A. Hardy, on the brief).

PER CURIAM

Plaintiff, the Estate of Mackenzie Jennings (Mackenzie),[1] by its Administratrix Michelle Jennings (Michelle), appeals from the trial court's July 17, 2023 order granting defendants, Diana Vitale, M.D., Vitale Women's Health Obstetrics and Gynecology, L.L.C., Ashley Papapetrou, D.O., and St. Joseph's Regional Medical Center's (St. Joseph's) motions for summary judgment. Plaintiff further appeals from the trial court's September 29, 2023 order denying

---

[1] Because certain parties share a common last name, we refer to them in this opinion by their first names. We intend no disrespect.

her motion for reconsideration. Following our review of the record and the applicable legal principles, we reverse.

I.

This medical negligence case involves an alleged failure to order a timely Cesarean section (C-section) based on abnormal fetal monitor findings purportedly resulting in the infant, Mackenzie, sustaining a neurological birth injury. The matter arises from the complications encountered during Michelle's labor and delivery of Mackenzie in August 2014 at St. Joseph's. After her birth, Mackenzie suffered numerous medical challenges including severe hypoxic ischemic encephalopathy. Throughout her life, Mackenzie required intensive at-home medical care and repeated hospitalizations, until her eventual death at age four in November 2018.

On August 18, 2014, at 8:26 p.m., Michelle was admitted to St. Joseph's by order of her private obstetrician, Dr. Vitale, who was not present at the time. Dr. Papapetrou, a second-year resident, evaluated Michelle upon her admission and apprised Dr. Vitale of Michelle's condition by telephone. Over the next hour and a half, Dr. Papapetrou observed Michelle periodically, monitoring her condition and checking the readouts of the fetal monitoring strips. Dr. Papapetrou stated she checked Michelle's status "every five to ten minutes."

3

Dr. Richard Luciani, plaintiff's standard of care expert, testified there were fetal heart decelerations at 9:30 p.m. and at 9:38 p.m. He stated the fetal monitoring strips recorded the next deceleration at 9:48 p.m., at which point, an emergent C-section should have been called to expedite Mackenzie's delivery by Dr. Papapetrou.

Dr. Luciani opined that when Dr. Papapetrou contacted Dr. Vitale at approximately 9:58 p.m., "at that point," Dr. Vitale should have ordered an emergent C-section. Specifically, he noted, "[Dr. Vitale] should have . . . moved [the patient] to the [operating room] and been on her way to the hospital. If there was [any other physician] available she should have told the resident . . . expedite this with anybody that's around." He further noted that if the C-section "had been called for appropriately at 9:48 [p.m.] . . . or shortly thereafter when the phone call was initiated [to Dr. Vitale] and . . . the patient was moved to the [operating room] . . . , obviously the C-section would have been started shortly after [10:00 p.m.], the delivery obviously could have occurred within five to ten minutes and the delivery would have occurred probably [fifteen] minutes quicker."

When asked if a delivery at 10:15 p.m. would have been within the standard of care, Dr. Luciani testified, "I think the baby getting out that late

4

would have been a little bit longer than I would have anticipated. I would have expected this baby to be delivered between 10:05 [p.m.] and 10:10 [p.m.] . . . . So even if we push it to the limit at 10:10 [p.m.], the baby was delivered at 10:27 [p.m.]," causing a delay of seventeen minutes after 10:10 p.m., and twenty-two minutes from 10:05 p.m.

Following Dr. Vitale's phone call with Dr. Papapetrou, Dr. Vitale stated that she was on her way to the hospital. At some point thereafter, Dr. Papapetrou asked a nurse to find the attending obstetrician on duty, Dr. Peter Balazs, to ask him to examine Michelle's fetal monitoring strips. The nurse located Dr. Balazs in the operating room, where he was completing a C-section on another patient, and asked him to look at Michelle's strips. He testified he was first made aware of Michelle's situation at approximately 10:12 p.m. He was concerned by Mackenzie's fetal heart tracings. He had already delivered the baby for his current patient, so he ensured there was no bleeding and directed his resident to finish the surgery.

Dr. Balazs stated he proceeded to Michelle's room within one to two minutes of viewing the strips. He then quickly assessed Michelle, and within two minutes, determined that Mackenzie should be delivered by emergent C-section. Dr. Balazs delivered Mackenzie at 10:27 p.m. Dr. Vitale arrived

5

thereafter and took over from Dr. Balazs, who returned to check on his other patient.

Plaintiff's causation expert, Dr. Stephen Thompson, opined in his report that Mackenzie suffered a neurological injury and multiple other medical issues due to "a delayed delivery of at least [twenty-five to thirty] minutes." He opined Mackenzie was going to suffer these injuries unless she was delivered by 10:18 p.m., thirty minutes from the 9:48 p.m. deceleration.

In March 2018, plaintiff filed her initial complaint against defendants. Following Mackenzie's death, plaintiff filed an amended complaint asserting wrongful death and survival claims in 2019.[2] Defendants subsequently moved for summary judgment. Both motions asserted plaintiff failed to provide sufficient causation testimony. In November 2020, the court[3] denied both motions and allowed for additional discovery to be completed.

In May 2023, defendants renewed their summary judgment motions, advancing similar arguments to those raised previously. On July 17, 2023, the

---

[2] Dr. Balazs was originally named as a defendant but was later voluntarily dismissed by all parties.

[3] The initial judge ruling on the summary judgment motions retired, and the motions at issue in this matter were decided by a different judge.

6

trial court granted both motions. On September 29, 2023, the court also denied plaintiff's motion for reconsideration.

II.

On appeal, plaintiff argues she did not have the burden of proving a doctor would have been available to perform the emergency C-section, if it had been timely called, and that the court granted the summary judgment motions based on issues not raised by defendants. Regardless, she contends the court erred in concluding Dr. Balazs would not have been available if the C-section had been timely called. Plaintiff maintains that because Dr. Balazs was never called, pursuant to the timeframe established by Dr. Luciani, Dr. Balazs was unaware of the grave danger Mackenzie faced until 10:12 p.m., when it was too late to have performed a C-section in time to prevent her neurological injuries.

"[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R. 4:46-2(c); see Brill v. Guardian Life Ins.

7

> Co. of Am., 142 N.J. 520, 540 (1995). On the other
> hand, when no genuine issue of material fact is at issue
> and the moving party is entitled to a judgment as a
> matter of law, summary judgment must be granted. R.
> 4:46-2(c); see Brill, 142 N.J. at 540.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344,
> 366 (2016).]

Reconsideration is "within the sound discretion of the [trial court], to be exercised in the interest of justice." In re Belleville Educ. Ass'n, 455 N.J. Super. 387, 405 (App. Div. 2018) (alteration in original) (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996)). When reviewing the denial of a motion for reconsideration, we look for an abuse of discretion. See Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (citing Kornbleuth v. Westover, 241 N.J. 289, 301 (2020)).

In determining whether the trial court correctly interpreted the law, we begin by "identifying the elements of the cause of action and the standard of proof governing th[e] claim." Bhagat v. Bhagat, 217 N.J. 22, 39 (2014). "To establish a prima facie case of negligence in a medical malpractice action, a plaintiff usually must present expert testimony to establish the relevant standard of care, the [medical provider's] breach of that standard, and a causal connection between the breach and the plaintiff's injuries." Rosenberg v. Tavorath, 352 N.J. Super. 385, 399 (App. Div. 2002) (citing Est. of Chin v. St. Barnabas Med. Ctr.,

8

160 N.J. 454, 469 (1999)); see also Ptaszynski v. Atl. Health Sys., Inc., 440 N.J. Super. 24 (App. Div. 2015). "Absent competent expert proof of these three elements, the case is not sufficient for determination by the jury." Rosenberg, 352 N.J. Super. at 399.

Here, in granting defendants' motions for summary judgment,[4] the court noted, "[n]either . . . [plaintiff] nor . . . [d]efendants dispute that Dr. Balazs could not have arrived earlier than he did and, in fact, he was dismissed from th[e] case." Moreover, it also found that Dr. Balazs's "'unavailability until 10:10 [p.m.]' . . . is a key fact on which the case hinges" and that "even if [d]efendants had called for [a C-section] [ten], [fifteen], or [thirty] minutes earlier, no attending obstetrician was available to perform it." (emphasis added). We conclude the court erred in finding it was an undisputed material fact that Dr. Balazs would have been unavailable had he been contacted earlier regarding the fetal heart tracings.

Initially, we observe Dr. Papapetrou's motion provided no citation to the record for the purported undisputed material fact that Dr. Balazs would not have

---

[4]  The court observed defendants' motions were "in effect" reconsideration motions. Because we conclude the court erred in granting summary judgment, we need not address plaintiff's argument that defendants did not comply with the procedural requirements for a motion for reconsideration.

A-0307-23

been available had he been called earlier.[5] In fact, plaintiff objected to this statement of fact based on Dr. Papapetrou's failure to properly cite to any portion of the record. Moreover, Dr. Balazs never testified he would have been unavailable to assist in performing an emergency C-section if contacted earlier. Although he was performing a C-section when contacted regarding Mackenzie's fetal monitor strips at or around 10:12 p.m., he was able to quickly respond to the emergency.

In addition, it is not clear if Dr. Balazs was in surgery at 9:48 p.m. or 9:58 p.m. Even if he was in surgery, if shown the strips at an earlier time, it is not an undisputed fact that he could not have had Michelle immediately prepped for a C-section so that she would have been ready for surgery at an earlier point in time. As Dr. Luciani noted, if Dr. Balazs had been called at 9:48 p.m. or 9:58 p.m. and advised there was a need to perform an emergent C-section, he could have moved Michelle to the operating room to "get the process going" so as not to waste another five or ten minutes. Because this was not done, he opined "time was wasted." Furthermore, Dr. Luciani testified that it is not clear if there may

---

[5] Likewise, Dr. Vitale's statement of material facts contains virtually no reference to any part of the record for the vast majority of its statement of undisputed facts, and the limited times she does refer to the record, she only makes reference to an entire deposition transcript, with no citation to a page or line number, contrary to Rule 4:46-2.

have been someone else other than Dr. Balazs available to do an emergency C-section.

Dr. Balazs was not contacted until 10:12 p.m., which was after the timeframe Dr. Luciani opined the C-section should have been completed. Moreover, it was beyond the time when it would have been possible for Dr. Balazs to have completed the C-section prior to 10:18 p.m., which Dr. Thompson opined was the "point of no-return."

Viewing the facts in a light most favorable to plaintiff, as we must for the purposes of summary judgment, we conclude the trial court erred in granting summary judgment. The court accepted defendants' argument regarding Dr. Balazs's unavailability when it was not an undisputed fact in the record. This, in turn, led the court to improperly grant defendants' summary judgment motions notwithstanding plaintiff's experts' testimony. When expert testimony shows "there are circumstances present from which a reasonable [person] could find that the [defendants'] want of due care was more likely the probable cause [of the victim's injury,] the issue of liability must go to the jury for determination." Bondi v. Pole, 246 N.J. Super. 236, 240 (App. Div. 1991) (quoting Germann v. Matriss, 55 N.J. 193, 208 (1970)).

A-0307-23

Because we determine the court should not have granted defendants' motions for summary judgment, we need not address its order denying plaintiff's motion for reconsideration. However, we add the following.

The court noted in its reconsideration decision: "There has been no specific testimony about the cause of the infant's . . . medical problems." Moreover, it noted Dr. Thompson "conceded" that the severe anemia experienced by Mackenzie could have caused all her findings exhibited at birth, and these conditions could "be seen as a consequence of the massive fetal maternal hemorrhage that occurred." However, Dr. Thompson testified, unequivocally, that Mackenzie's deficits "were not related to [the] fetal maternal hemorrhage." Rather, he testified she sustained hypoxic ischemic encephalopathy as a result of the delay in her delivery. Accordingly, Dr. Thompson's purported concession should not have formed a basis for the court's decision on reconsideration.

Regarding the medical causation issue, Dr. Thompson opined Mackenzie suffered a neurological injury and multiple other medical issues because of "a delayed delivery of at least [twenty-five to thirty] minutes." Dr. Thompson was asked during his deposition:

A-0307-23

Q. So what I'm asking you is if this baby were born five minutes earlier, would the outcome be the same?

A. Yes.

Q. If the baby was born ten minutes earlier, would the outcome be the same?

A. Most likely, yes, but it's impossible to know. We are not going to be able to know. We can have this -- go ahead.

Q. All right. So, if the baby were born [fifteen] minutes earlier, more likely than not would the outcome be the same?

A. Yes.

Q. If the baby were born [twenty] minutes earlier, more likely than not would the outcome be the same?

A. Yes.

Q. If the baby were born [twenty-five] minutes earlier, more likely than not, would the outcome be the same.

A. Hang on one second. I wrote [twenty-five] to [thirty] minutes earlier. So at [twenty-five] minutes or longer -- [twenty-five] minutes or more, we might have had a better outcome. We don't know. I wrote [twenty-five] to [thirty] minutes. I can't give you a better answer than what's in my report.

13

Dr. Papapetrou contends this testimony suggests that Dr. Thompson opined that "for this baby to have had any chance of a better outcome, she had to be delivered . . . by 10:02 [p.m]." Dr. Papapetrou states that because Dr. Balazs was purportedly unavailable, and given Dr. Luciani's standard of care testimony, the earliest the baby could have been delivered would have been between 10:05 p.m. and 10:10 p.m., "which is outside Dr. Thompson's window of opportunity."

However, earlier in the deposition Dr. Thompson was asked: "And your opinion in this case that an earlier delivery by [thirty] minutes . . . would have changed the outcome, is based on the MRI report?" He responded:

> No. No. I'm not basing my opinion only on the MRI report . . . . What I'm saying is that we know that this baby had abnormal strips [thirty] minutes prior to delivery. . . . [T]he thirty minutes prior to the baby being delivered . . . during which the baby was severely hypotensive, that period of time was sufficient to result in a partial prolonged pattern of hypoxic ischemic injury.

Moreover, Dr. Thompson noted in a supplemental certification that defendants misconstrued his testimony and his causation opinion is not based "on the fact that an earlier delivery by [thirty] minutes would have changed the outcome." He explained that his opinion was based on a calculation of the twenty-five to thirty-minute period from the observation of the abnormal fetal

14

strip at 9:48 p.m. Specifically, he noted "Mackenzie was going to suffer her injuries if she was not delivered by 10:18 [p.m.], the [thirtieth] minute after 9:48 p.m.," and that Mackenzie was not delivered until 10:27 p.m.—thirty-nine minutes after the abnormal strips at 9:48 p.m., which he characterized as the "point of no-return." He further emphasized his opinion does not start at the end of the period to which Dr. Luciani testified.

We are satisfied Dr. Thompson's deposition, read in conjunction with his report and certification, coupled with the testimony of Dr. Luciani, creates a fact issue regarding the issue of proximate cause that must be addressed by a fact finder and cannot be resolved on summary judgment. In the context of a summary judgment motion, the judge does not weigh the evidence, or resolve credibility disputes. These functions are uniquely and exclusively performed by a jury. Parks v. Rogers, 176 N.J. 491, 502 (2003); Brill, 142 N.J. at 540. We have previously noted that a credibility issue requiring a jury determination is raised by a witness's inconsistent statements, and a judge may not decide which of the conflicting versions is more credible. Conrad v. Michelle & John, Inc., 394 N.J. Super. 1, 14 (App. Div. 2007). Accordingly, the trial court erred in granting defendants' summary judgment motions and denying plaintiff's motion for reconsideration.

A-0307-23

Reversed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division