WYOMING OUTDOOR COUNCIL, POWDER RIVER BASIN RESOURCES COUNCIL, Biodiversity Associates, and Jerry Freilich, Petitioners,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Respondent,

and

Petroleum Association of Wyoming, Intervenor.

No. 02–CV–155–D.

United States District Court, D. Wyoming.

Jan. 7, 2005.

James B Dougherty, Washington, DC, McCrystie Adams, Earthjustice Legal Defense Fund, Neil Levine, Earthjustice,

Denver, CO, Steve Jones, Wyoming Outdoor Council, Lander, for Plaintiffs.

Carol A Statkus, U.S. Attorney's Office, Cheyenne, Caroline Meredith Blanco, Department of Justice, Environment & Natural Resources Division, Washington, DC, David A Carson, Department of Justice, Denver, CO, Eileen T McDonough, Department of Justice, Environmental Defense Section, Washington, DC, Lori L Caramanian, Department of Justice, Denver, CO, Thomas A Nicholas, III, Hirst & Applegate, Cheyenne, Zach C Miller, Davis Graham & Stubbs, Denver, CO, for Defendants.

## ORDER ON PETITION FOR REVIEW OF AGENCY ACTION

DOWNES, District Judge.

This matter comes before the Court on Wyoming Outdoor Council, Powder River Basin Resource Council, and Biodiversity Conservation Alliance's Petition for Review of Agency Action. The Court having reviewed and carefully considered the extensive materials submitted in support and opposition, having heard oral argument, and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

Petitioners Wyoming Outdoor Council, Powder River Basin Resource Council, and Biodiversity Conservation Alliance (collectively referred to as "WOC") challenge the decision of the U.S. Army Corps of Engineers ("Corps") to issue General Permit 98–08 ("GP 98–08"), a permit issued under the Clean Water Act ("CWA"), 33 U.S.C. § 1344(e). GP 98–08 was issued in large part to address the growing need for permits to discharge dredge and fill materials associated with the boom in development of coalbed methane gas ("CBM") in the Powder River Basin of Wyoming. The production of CBM necessarily requires that large amounts of subsurface water be released on to the surface. The quality of the released water varies depending on location and the effects of the released water on the environment are hotly contested. In many cases, the water is stored in containment ponds on the surface. One of the most controversial uses of GP 98–08 is to permit the release of dredge and fill material for the formation of reservoirs to contain the released CBM water.

GP 98–08 was issued on June 20, 2000, along with a Combined Decision Document ("CDD") that purports to comply with requirements under both the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 et seq., and the CWA, 33 U.S.C. § 1344(e), for issuance of general permits. GP 98–08 authorizes discharge of dredge and fill materials associated with several activities related to oil and gas development in the State of Wyoming, including surveys, roads, well pads, utilities, reservoirs, erosion control, hazardous waste cleanup, and mitigation. GP 98–08, Appx. A, A.R. 573–74. No activity can fill more than .30 acre of wetlands and any activity exceeding this maximum must receive an individual permit. Id. Several conditions are attached to the application of GP 98–08. GP 98–08, Appx. B, A.R. 575–77 ("Special Conditions"). The permittee must comply with the Wyoming Department of Environmental Quality's water quality certification pursuant to § 401 of the CWA. A.R. 575. To address impacts to threatened and endangered species, notice must be given to the Corps before activity can be undertaken on non-federal lands with non-federal minerals in certain geographical locations. A.R. 577. Wetland mitigation is also required. Temporarily filled wetlands must be restored and permanent fills of more than .25 acre must be replaced at a 1:1 ratio. A.R. 576.

GP 98–08 permits dredge and fill activities on any land in Wyoming if the permit

specifications are met. However, the role of the Corps with respect to different types of land across the state varies. For dredge and fill on land where the surface and minerals are privately owned, the Corps is the only permitting authority and administers GP 98–08. On federal public lands, the Bureau of Land Management ("BLM") is the permitting authority that generally regulates oil and gas development and grants applications for permits to drill. 43 C.F.R., pt 23; 43 C.F.R. § 3162.3–1. In conjunction with any application for a permit to drill, an oil and gas developer must submit to the BLM a surface use plan. 43 C.F.R. § 3162.3–1. The surface use plan will be reviewed by the BLM if development is proposed on BLM land or by the United States Forest Service ("USFS") if development is proposed in a National Forest. *Id.;* 36 CFR § 228.106(a). The surface management agency, whether it be BLM or USFS, administers the use of GP 98–08 in conjunction with approval of surface use plans when the plan proposes discharge of dredge and fill material into waters of the United States on federal lands. As such, after issuing GP 98–08, the Corps' generally administers the application of GP 98–08 only on private land.

WOC presents two basic issues in its Petition for Review: (1) whether the Corps violated NEPA, 42 U.S.C. § 4332, by failing to consider cumulative impacts to non-wetland resources, impacts to water quality, impacts to private ranchlands, impacts to threatened and endangered species, and impacts to wetlands, while relying on unsupported mitigation measures to support a finding of no significant impact and issuance of an Environmental Assessment ("EA"); and (2) whether the Corps violated the CWA, 33 U.S.C. § 1344(e), and its implementing regulations, 40 C.F.R. § 230.7, by failing to support its findings that the impacts of GP 98–08 would be cumulatively minimal and that the activi-

ties permitted would be both similar in nature and similar in impact.

The Court finds that the Corps violated NEPA by failing to consider the cumulative impacts of GP 98–08. The fact that cumulative impacts were not discussed in relation to any resource other than wetlands, necessitates the Court's conclusion that the Corps could not have found the cumulative effects of GP 98–08 to be minimal in order to comply with the CWA. The Corps also failed to sufficiently consider the potential impacts to ranchlands held by private surface owners with no rights to the minerals. Finally, the Court holds that the Corps' reliance on mitigation measures that were unsupported by any evidence in the record cannot be given deference under NEPA. The Court remands to the Corps for further findings on cumulative impacts, impacts to ranchlands, and the efficacy of mitigation measures.

## STANDARD OF REVIEW

■■■ A federal agency's compliance with NEPA and the CWA is subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* Review of agency action in this Court is treated as an appeal. 5 U.S.C. § 706; *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1580 (10th Cir.1994). The Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Greater Yellowstone Coalition v. Flowers,* 359 F.3d 1257, 1274 (10th Cir.2004). "[T]he scope of review under the 'arbitrary and capricious' standard is narrow, but not without dimension." *Olenhouse,* 42 F.3d at 1576. The Court is first required to "review the [agency's] decisionmaking process and determine whether the [agency] examined all relevant data and articulated a satisfactory explanation for its action, including a ra-

tional connection between the facts found and the choice made." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The Court must decide whether the agency made a "clear error in judgment." *Id.* at 1574. Agency action will be set aside

> if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. 2856.)

■■■ The Court is also charged under an arbitrary and capricious standard with a plenary review of the record as it existed before the agency to determine "whether the agency's action was supported by substantial evidence." *Id.* at 1576. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pennaco Energy, Inc. v. U.S. Dept. of Interior,* 377 F.3d 1147, 1156 (10th Cir.2004) (quoting *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir.2003)). "This is something more than a scintilla but something less than the weight of the evidence. Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." *Id.* (citations and quotations omitted). If the agency's findings of fact are supported by substantial evidence, they are conclusive. *Custer County Action Ass'n. v. Garvey,* 256 F.3d 1024, 1030 (10th Cir.2001). "The substantial-evidence standard does not allow [the court] to displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a differ-

ent choice had the matter been before it de novo." *Id.* (citations and quotations omitted).

■■■ Although the arbitrary and capricious standard is "searching and careful," ultimately, the standard of review "is a narrow one." *Id.* (quoting *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). "[A]dministrative determinations can be set aside only for substantial procedural or substantive reasons." *Lee v. U.S. Air Force,* 354 F.3d 1229, 1236 (10th Cir. 2004) (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1164 (10th Cir.2002)).

### DISCUSSION

### I. NEPA Claim

WOC challenges the issuance of GP 98–08, asserting that the Corps violated NEPA by: (1) failing to consider impacts to various resources, cumulative impacts in particular, and (2) relying on unsupported mitigation measures to issue a finding of no significant impact ("FONSI"). WOC asserts that if the impacts are considered, a significant impact is demonstrated, necessitating the preparation of an EIS covering GP 98–08. 42 U.S.C. § 4332(C). WOC regards the preparation of an EA as insufficient.

#### 1. Statutory and Regulatory Background

■■■ The National Environmental Policy Act of 1969 was enacted to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Na-

tion." 42 U.S.C. § 4321; *see Dept. of Transportation v. Public Citizen,* 541 U.S. 752, 124 S.Ct. 2204, 2209, 159 L.Ed.2d 60 (2004). NEPA mandates that federal agencies take into consideration the impacts of their actions on the environment in the hopes that such consideration will lead to environmentally sound decisions that balance the needs of humans and the environment in which they live. 42 U.S.C. § 4332. Although NEPA " 'prescribes the necessary process' by which agencies must take a 'hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information;' it 'does not mandate particular results.' " *Custer County,* 256 F.3d at 1034 (quoting *Colorado Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1171–72 (10th Cir.1999)). In other words, NEPA "prohibits uninformed—rather than unwise— agency action." *Id.* (citations and quotations omitted); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

NEPA mandates that for any agency action "significantly affecting the quality of the human environment" an environmental impact statement ("EIS") be prepared which discusses, among other things, the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided, and alternatives to the proposed action. 42 U.S.C. § 4332. When it is not clear whether a proposed agency action implicates significant impacts such that an EIS is required, the agency can prepare a less detailed environmental assessment ("EA"). 40 C.F.R. § 1501.4(b); *Greater Yellowstone Coalition,* 359 F.3d at 1274. An EA should be a "concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]" and includes a "brief discussion[ ] of the need for the proposal, of alternatives ..., of the envi-

ronmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9; *DOT v. Public Citizen,* 124 S.Ct. at 2210. "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact ('FONSI') and forego the further step of preparing an EIS." *Greater Yellowstone Coalition,* 359 F.3d at 1274; 40 C.F.R. § 1501.4(e).

"An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *Greater Yellowstone Coalition,* 359 F.3d at 1274 (citations and quotations omitted). The Court's review of this decision "requires [the Court] to determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Id.* (quoting *Davis v. Mineta,* 302 F.3d 1104, 1112 (10th Cir.2002)) (internal quotation marks omitted).

### 2. Consideration of Impacts

NEPA requires that an EA briefly discuss the environmental impacts of a proposed action to provide a basis for a determination on whether to prepare an EIS. 40 C.F.R. § 1508.9. If the impacts will have a significant effect on the human environment, an EIS must be prepared. 42 U.S.C. § 4332. WOC contends that the Corps' consideration of the following impacts was insufficient to support a FONSI.

#### a. Cumulative Impacts to Non–Wetland Resources

NEPA's implementing regulations explain that a finding of significance "requires consideration of both context and intensity." 40 C.F.R. § 1508.27. Intensity "refers to the severity of the impact." *Id.*

§ 1508.27(b). The regulations go on to say,

> Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity: ... Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. *Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.* Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

*Id.* § 1508.27(b)(7) (emphasis added). In essence, cumulative impacts have the potential to indicate a significant effect and mandate the preparation of an EIS to consider those impacts. A NEPA analysis requires the consideration of cumulative impacts in an EA. *See, e.g., Utah Shared Access Alliance v. U.S. Forest Service,* 288 F.3d 1205, 1214 (10th Cir.2002) (finding that the Forest Service's EA, which included an in-depth assessment of direct and indirect effect, as well as cumulative effects, was sufficient); *Davis v. Mineta,* 302 F.3d 1104, 1125 (10th Cir.2002) ("The EA does not provide an adequate discussion of the cumulative impacts of the Project on the human environment."); *American Canoe Association v. White,* 277 F.Supp.2d 1244, 1255–56 (N.D.Ala.2003). Cumulative impact is defined by the regulations as "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

WOC argues that the Corps failed to evaluate cumulative impacts with regard to non-wetland resources.[1] The Corps' discussion of cumulative impacts in its decision document with regard to non-wetland resources reads in its entirety, "Cumulative Effects—Reliable information is not available to properly assess potential cumulative effects on all of the various public interest factors. The Corps will evaluate the potential effects of individual projects on the public interest as needed prior to issuing authorization." A.R. 535, ¶ 3.3.4. The only other mention of cumulative impacts that might apply to non-wetland resources in the CDD is in the summary of how the project complies with the § 404 guidelines set forth in 40 C.F.R., part 230, discussed in detail below. A.R. 546. The Corps wrote, "Have the project's Cumulative and Secondary Effects been considered (230.11(g,h))? Yes, potential cumulative effects have been considered during development of GP 98–08 and potential secondary effects will be evaluated prior to issuance of final authorization for specific projects." A.R. 546, ¶ 4.8.8.

---

1. The Court notes that WOC's argument refers to the Corps' failure to consider "collective" impacts. WOC's reply brief draws a distinction between "collective" and "cumulative" impacts, stating that "collective" or "total" impacts are those that are "caused by activities authorized under GP 98–08—not impacts resulting from future actions not authorized under the permit." Reply Br. at 3. The challenge to the Corps' assessment of "collective impacts," however, is a challenge to the section of the CDD entitled "cumulative effects." A.R. 535, ¶ 3.3.4. The distinction is one without a difference. The regulatory definition of "cumulative" impacts states that cumulative impacts "can result from individually minor but *collectively* significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (emphasis added). In effect, the definition of "cumulative impacts" encompasses the "collective impacts" for which WOC complains there was inadequate review.

The Corps now argues that it properly considered cumulative impacts to wetlands and that consideration of cumulative impacts to non-wetland resources is beyond the scope of the activities authorized by GP 98–08. The Corps asserts that it should not be obligated to undertake a broad-based analysis of impacts from CBM development. Though true that the Corps need not undertake a broad-based analysis of cumulative impacts of all CBM development in Wyoming, the Corps must at least assess the cumulative impacts that are likely to result from the issuance of GP 98–08. The Court recognizes that the Corps has no responsibility for or control over CBM development on public lands managed by other federal agencies, or private lands when drilling will not implicate discharge of dredge and fill material into waters of the United States. The United States Supreme Court in a recent decision held that when an agency "has no ability to prevent a certain effect," the agency does not cause the impact. *Department of Transportation v. Public Citizen*, 541 U.S. 752, 124 S.Ct. 2204, 2217, 159 L.Ed.2d 60 (2004). Undoubtedly, CBM development would continue even without GP 98–08. When a particular oil and gas developer, however, proposes to discharge dredge and fill material into the waters of the United States in conjunction with a project, the Corps, or the relevant surface management agency, becomes the gatekeeper for approval of the project. The project becomes "so interdependent that it would be unwise or irrational to complete [the development] without [a permit to discharge dredge and fill material]." *Utahns for Better Transportation v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1173 (10th Cir.2002). The Corps is obligated to assess cumulative impacts relating to projects in which the use of GP 98–08 is essential to completion of the project to determine whether the impacts of those projects on the human environment will be significant.

The Corps asserts that its discussion of cumulative impacts as they pertain to wetlands is a sufficient discussion of cumulative impacts. An assessment of cumulative impacts in an EA, however, cannot be limited to impacts to wetlands. The purpose of an EA is to determine whether the agency must prepare and EIS. 40 C.F.R. § 1501.4(b). In order for the agency to conclude an EIS is unnecessary, it must make a finding that there will be no significant impact on the human environment from the proposed agency action. 40 C.F.R. §§ 1508.9; 1508.13. The "human environment" is defined "comprehensively to include the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14. Although the Corps' primary function in issuing § 404 permits under the CWA is to protect the integrity of the waters of the United States, 33 U.S.C. § 1251(a), like any other federal agency taking action that could affect the human environment, its NEPA analysis in issuing a § 404 permit must include consideration of cumulative impacts to the "the natural and physical environment," 40 C.F.R. § 1508.14, not just impacts to wetlands.

 The Corps also argues that it is impossible to know "precisely what specific impacts might result until a particular project is proposed." Resp. Br. at 39. For this reason, the Corps has passed on the responsibility of assessing cumulative impacts to the BLM and the USFS, which are responsible for issuing permits to drill on federal lands, and itself when drilling is conducted on private lands, on an individual permit basis. *Id.* The CDD states, "The Corps will evaluate the potential effects of individual projects on the public interest *as needed* prior to issuing authorization." A.R. 535, ¶ 3.3.4 (emphasis added). Al-

though the Court recognizes that "[c]ertainty as to the cumulative effects of resource development projects require prophecy beyond the capabilities of both scientists and courts," the Corps must at least "mention and discuss foreseeable problems." *Manygoats v. Kleppe,* 558 F.2d 556, 560–61 (10th Cir.1977). A determination as to whether the impacts of a general permit will be cumulatively significant cannot be foregone based on the assurance that they will be reviewed on an individual permit basis later during oil and gas development. *Pennaco Energy v. U.S. Dep't of Interior,* 377 F.3d 1147, 1159 (10th Cir.2004) ("Agencies are required to satisfy the NEPA 'before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values.' ") (quoting *Sierra Club v. Hodel,* 848 F.2d 1068, 1093 (10th Cir.1988)). By their very nature, the "cumulative impacts" of a general permit cannot be evaluated in the context of approval of a single project. Even if it were possible to assess cumulative impacts at a later time on an individual permit basis, the Corps' assurance that cumula-

tive effects will be evaluated "as needed" is so vague as to ring hollow with the Court.

■■■ The Corps' failure to assess, in any way whatsoever, the cumulative impacts of GP 98–08 on environmental resources other than wetlands is arbitrary and capricious. 5 U.S.C. § 706(2)(A). This Court finds the Corps' assessment of the cumulative impacts of GP 98–08 to be wholly deficient. A.R. 535, ¶ 3.3.4. The Court cannot defer to an EA/FONSI which has neglected, by its own terms, to even attempt to assess the extent of cumulative impacts that might be attributed to the agency action. The Court remands to the Corps to give the agency an opportunity to support its FONSI with regard to cumulative impacts to non-wetland resources. The Corps must assess cumulative impacts to such a degree as to assure this Court that its issuance of a FONSI was not arbitrary and capricious.[2]

### b. Impacts to Water Quality

WOC argues that the Corps failed to evaluate or disclose impacts to water quality, reasoning that it had no control over

---

**2.** WOC has asked the Court to overturn the Corps' FONSI based in part on the comments submitted to the Corps by the Environmental Protection Agency ("EPA") and FWS regarding the potential cumulative impacts of GP 98–08. Pet. Br. at 18 (citing A.R. 216–17, 298–99, 368, 371). NEPA, however, requires only that an agency "consider and respond to the comments of other agencies, not agree with them . . . ." *Davis v. Mineta,* 302 F.3d at 1123 (quoting *Custer County Action Ass'n,* 256 F.3d at 1038). The Court can consider the comments of other agencies for determining whether the agency's conclusions have a "substantial basis in fact." *Id.* (quoting *Sierra Club v. U.S. Amy Corps of Eng'rs,* 701 F.2d 1011, 1030 (2d Cir.1983)). In this case, the comments provided by EPA and FWS lend further support to the Court's determination that the Corps' failure to evaluate cumulative impacts to non-wetland resources was arbitrary and capricious. ·A.R. 216–17, 298–99, 368, 371. The Court declines, however, to

make a finding of significant impact and mandate the preparation of an EIS. As the Tenth Circuit so aptly stated,

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, *except in rare circumstances,* is to remand to the agency for additional investigation or explanation.

*Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1226 (10th Cir.2002) (quoting *Sierra Club v. Hodel,* 848 F.2d 1068, 1093 (10th Cir.1988)). Here, the Corps has failed to consider all relevant factors and the more prudent course is to remand to the Corps, giving the agency an opportunity to evaluate the cumulative impacts of GP 98–08 and review its FONSI in light of that evaluation.

the discharge of produced water, and that state agencies, *i.e.*, the Wyoming Department of Environmental Quality ("WDEQ") and the Wyoming State Engineer's Office ("WSEO"), regulate and control such impacts. WOC asserts that the Corps has more control than it admits. In some cases, before a permit can issue from the state agency authorizing the discharge and impoundment of produced water, the Corps must issue its permit authorizing the discharge of dredge and fill material. WOC also argues that NEPA requires full compliance even if another agency regulates an environmental resource.

The Corps counters that it did not fail to disclose the potential impacts to water quality, but briefly and adequately described the potential impacts. The Corps contends that control of the water lies with the WDEQ, which authorizes the discharge of CBM water under § 402 of the CWA when the water complies with water quality standards, and the WSEO, which regulates the construction of reservoirs associated with CBM water. In addition, the Corps argues that the WDEQ § 401 water quality certification associated with GP 98–08, issued on April 7, 1999, sufficiently addresses any water quality concerns.

 Impacts to water quality are impacts to the human environment and, if significant, could necessitate the preparation of an EIS. *See* 42 U.S.C. § 4332(C); 40 C.F.R. 1508.14. Accordingly, impacts to water quality should be considered when there is potential that a § 404 permit will significantly affect water quality. *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir.1993) (reviewing the sufficiency of the Corps' consideration of water quality impacts). However, "NEPA does not require federal agencies to examine every possible environmental consequence. Detailed analysis is required only where impacts are likely." *Izaak Walton League of*

*Am. v. Marsh,* 655 F.2d 346, 377 (D.C.Cir. 1981). The CDD for GP 98–08 addresses impacts to water quality. A.R. 531, 533, 543. The Corps acknowledges that "natural gas production from CBM wells can result in significant changes in both quantity and timing of flows due to the discharge of produced water directly into streams." A.R. 543, ¶ 4.6.1.3. The Corps also recognizes that "oil and gas production can generate numerous hazardous chemicals that could effect [sic] water quality" and that "discharges of produced water from CBM wells may effect [sic] salinity in surface waters." A.R. 543, ¶¶ 4.6.1.3, 4.6.1.6.

 Coupled with the Corps' acknowledgment of potential impacts to water quality associated with CBM development is the Corps' recognition that the WDEQ and WSEO more directly control the discharge of produced water. The Corps has no authority to permit or forbid the release of water associated with CBM production. The WDEQ maintains that authority under § 402 of the CWA. In the case of GP 98–08, the WDEQ issued a § 401 water quality certification, which requires individual review of any discharge into Class 1 waters or waters requiring a Total Maximum Daily Load in accordance with water quality standards. A.R. 236. The WDEQ water quality certification also puts special conditions on discharges associated with pipeline construction. A.R. 237. GP 98–08 mandates that permittees comply with all conditions issued in the WDEQ water quality certification. GP 98–08, Appx. B, A.R. 575 ("Special Conditions"). These conditions effectively ameliorate any concern that impacts on water quality will be significant. The Court does not find the Corps' consideration of impacts to water quality and reliance on the WDEQ water quality certification to be arbitrary and capricious.

### c. Impacts to Private Ranchlands

WOC asserts that the Corps refused to consider and disclose impacts to privately-owned ranchlands. The CDD addresses private lands twice. First, the Corps states,

> On non-federal lands and minerals the Corps gives full consideration of the landowner's desires for land use. In those instances, oil and gas production cannot occur without the landowner's consent. Therefore, it would not be possible for the Corps to authorize a project over the objections of a private landowner with mineral rights but the Corps may impose limitations or conditions that control how and where a project is implemented which may differ from the landowner's plans for the area. ... In summary, it is very unlikely that the use of GP 98–08 to authorize a project on non-federal lands with non-federal minerals would be opposed by the landowner.

A.R. 531, ¶ 3.2.6. The Corps goes on to state, "Most farmland is located on non-federal land with non-federal minerals where the landowner has full control over surface disturbance. It is anticipated that in most cases the landowner would not allow destruction of prime or unique farmland due to its high value." A.R. 534, ¶ 3.2.23. WOC argues that the conclusions made in the CDD with regard to private ranchlands are factually incorrect and that the law and the record before the agency contradict them.

Impacts to private lands should be considered in determining whether impacts are significant under NEPA. The regulations provide guidance on evaluating significance. 40 C.F.R. § 1508.27. Significance requires an evaluation of both context and intensity. *Id.* "The following should be considered in evaluating intensity: ... Unique characteristics of the geographic area such as proximity to ... prime farmlands." *Id.* § 1508.27(b)(3). The Tenth Circuit has held that impacts to farmlands can lead to a finding of significance. *Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1229 (10th Cir.2002) ("Given the aesthetic, economic, ecological, and cultural value of agriculture to the region, even a loss of 2,000 acres of irrigated farmland is significant.").

The CDD asserts that landowners have full control over surface disturbance on private lands and would not allow loss of prime farmlands, leading to the conclusion of no significant impact.[3] The degree of control over surface disturbance is misstated by the Corps and does not take into account the plight of the surface owner of a split-estate. A split-estate is one in which the surface and minerals are owned and controlled by different parties. The mineral estate is the dominant estate. *Mingo Oil Producers v. Kamp Cattle Co.,* 776 P.2d 736, 741 (Wyo.1989). In Wyoming, the mineral estate owner has the right to use "that portion of the surface estate 'reasonably necessary' to the production and storage of the mineral ...." *Id.* Accordingly, contrary to the Corps' conclusion that landowners have full control over surface disturbance, the surface owner has no right to deny access or sur-

---

**3.** The Corps makes one other observation that is relevant to private ranchlands. In its evaluation of the public interest factors required to be considered by the Corps in issuing a permit, 33 C.F.R. § 320.4(a), the Corps notes with regard to "Food and Fiber Production" that "[a]dverse effects on livestock grazing could occur as a result of changes in land use and water use, both of which are beyond the Corps' ability to control." A.R. 534, ¶ 3.2.25. The Corps neither explains how such adverse effects could occur or why effects on livestock grazing are beyond its control. The statement does not reflect a realistic assessment of the possible significance of those impacts.

face disturbance that is "reasonably necessary" to oil and gas production.

In this case, the administrative record voices the concerns of private surface owners in the Powder River Basin, the heartland of CBM production, that drilling companies, with general disregard for surface owners, are impacting their lands and their livelihoods. For example; one landowner wrote to the Corps,

> CBM development is resulting in disregard of the surface owners [sic] rights. These large out of state gas companies pretty much run roughshod over the private owner of the land .... They come on property without asking permission. They often refuse to inform landowners or lessees about their plans for gas gathering or water discharge. The damage fees they offer is [sic] an insulting amount. They gouge huge areas for roads and drilling sites, much larger than is necessary. Surface property is devalued because of the encumbrances by third party easements and the damage and noise cased [sic] by CBM hardware.

A.R. 415. Another rancher wrote,

> We have experienced this greed first hand on our ranch south of Gillette, Wyoming. The coalbed methane gas company came to our ranch with many promises in 1996. They have broken all of their written promises (the surface owner agreement), and have failed at reclamation, controlling their water discharges, water well mitigation, maintaining all weather roads, controlling the production of coalbed methane gas, and interfering with ranch operations. Besides causing livestock injuries, deaths, and straying, these people also threaten our community with their drinking, littering, and cussing. In addition to these abuses, the coalbed methane dewatering is damaging the aquifer we depend on for domestic and livestock water.

A.R. 335.

 The Corps clearly failed to address the concerns of these private landowners in the CDD.[4] The conclusions in the CDD, which are contrary to established Wyoming law, reflect indifference to the interests of surface owners of split-estates. Nowhere does the CDD express or demonstrate a consideration for those individuals whose livelihood depends on the vitality and sustainability of the land. The Court cannot accept the Corps' summary dismissal of the reasonably foreseeable impacts to private ranchlands.[5] Though the Corps need not provide an inordinate amount of detail on impacts to private ranchlands, neither can the Corps completely disregard those impacts in light of the comments of private surface owners. The Corps must at least recognize the reasonably foreseeable impacts and give a

---

4. Interestingly, in the same manner it addressed cumulative impacts, as discussed above, the Corps addresses any possible impacts to private ranchlands by stating, "The Corps *may* also deny the use of GP 98–08 for a project which would require a more rigorous individual permit review. In that case, a final decision on issuance of a permit is beyond the context of this evaluation." A.R. 531, ¶ 3.2.6 (emphasis added). The Corps gives no guidance or criteria for when a project would "require a more rigorous individual permit review" for the protection of private lands. As the Court has noted, this kind of hollow assurance does not excuse the Corps'

duty under NEPA to consider the possible impacts of GP 98–08 on the private ranchlands.

5. Nor can the impacts to private lands be deemed trivial. In calculating the impacts to wetlands in the CDD, the Corps concludes that of the total number of CBM wells that could be drilled (34,560) during GP 98–08's duration, approximately 70% (24,160) would be drilled on land where the surface is privately owned. Clearly, the development of CBM is not limited to federal lands, but has implications for private lands as well.

cogent reason why they are not significant. The Corps' failure to do so was arbitrary and capricious.

### d. Impacts to Threatened and Endangered Species

NEPA requires the consideration of impacts to threatened and endangered species in determining whether the impacts of a proposed action will be significant. *See* 40 C.F.R. § 1508.27(b)(9) (determination as to significance requires consideration of the degree to which the action may adversely affect an endangered or threatened species or its habitat); 42 U.S.C. § 4332(C). WOC argues that the Corps failed to assess the impact of GP 98–08 on endangered species and that the Corps' assurance that it may undertake Section 7 consultations pursuant to the Endangered Species Act ("ESA") on an individual basis is legally deficient. The Corps asserts that the permit conditions sufficiently address any significant impacts and satisfy the analysis required by NEPA.

■ The scope of the consideration of impacts in NEPA review can be affected by whether a mitigation plan "obviates" the need to evaluate the impacts. *See Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1526 (10th Cir.1992) ("In our view, the necessity for specifically seeking out and including in either the FEIS or a subsequent or supplemental NEPA document such additional information was obviated by the Corps' decision to issue its permit with the specific conditions . . . ."). In other words, when the permit imposes conditions that will minimize the impacts, the Corps' obligation to discuss those impacts is lessened. The CDD does discuss, if only briefly, the reasonably foreseeable impacts to fish and wildlife resulting from GP 98–08. A.R. 529–30, ¶ 3.2.2. The Corps acknowledges that "[a]uthorized activities could have adverse effects on terrestrial and aquatic wildlife," including threatened and endangered species. *Id.* at 529. The agency goes on to describe the possible impacts during drilling operations and road and pipeline construction. *Id.* The Corps recognizes the danger posed by waste pits that attract migratory birds. *Id.* Finally, the Corps discusses the impact that loss of wetlands could have on fish and wildlife. *Id.* at 530.

In addition to discussing reasonably foreseeable impacts, the CDD details the conditions required by GP 98–08 that ameliorate the potential impact to threatened and endangered species. The CDD, consistent with the conditions of GP 98–08, states,

> Activities that are likely to jeopardize the continued existence of threatened or endangered species would not be authorized. Therefore, the Corps must evaluate all regulated activities that "may effect" [sic] listed species in areas where the Corps is the lead federal agency (i.e. non-federal lands with non-federal minerals) and consult with the U.S. Fish and Wildlife Service when necessary. In order to accomplish that requirement, prospective permittees would be required to notify the Corps prior to undertaking any activities on non-federal lands with non-federal minerals [in specific] geographic areas . . . . [6]

6. The specific geographic areas requiring notice are as follows:

 a. Perennial and ephemeral streams and associated wetlands between 4,000 and 7,000 feet mean seal level (msl) in Converse, Goshen, Laramie, Platte, and Niobrara Counties and in the Green River basin.

 b. Within 0.5 miles of and including the Hutton Lake and Mortenson Lake National Wildlife Refuges and all sections in Township 15 North, Range 75 West, Albany County.

 c. Wetland areas located in a floodplain below 8,100 feet msl within the North Platte River, South Platte River, and Lodgepole Creek Basins east of the crest of the Laramie Mountains in Albany, Converse, Goshen, Laramie, and Platte Counties.

A.R. 530. In fact, GP 98–08 requires that notice be given as detailed in the CDD. GP 98–08, Appx. B, A.R. 577 ("Special Conditions").

 The Corps' analysis of the impacts to threatened and endangered species cannot be considered arbitrary and capricious. The Corps' reliance on the permit conditions was rational and does not amount to a "clear error in judgment." *Olenhouse,* 42 F.3d at 1574. Unlike the Corps' hollow assurances of individual review, discussed above with regard to cumulative impacts to non-wetland resources and private ranchlands, here the Corps has laid out a definite plan for individual review of projects taking place within designated areas. The Court will not presume at this stage in the proceedings that the Corps will fail to comply with its obligation to perform individual review for the protection of threatened and endangered species. In addition, the Corps acknowledged the potential impacts to fish and wildlife absent permit conditions. The Corps' issuance of a FONSI with regard to impacts to threatened and endangered species was not arbitrary and capricious.

e. Impacts to Wetlands

WOC next contends that the Corps ignored the impact of GP 98–08 on wetlands. WOC asserts that although the Corps made a determination that 574 acres of wetlands in Wyoming would be destroyed, it failed to analyze the significance of the loss of these wetlands. WOC further ar-

gues that the fact that mitigation measures were mandated by the Corps does not eliminate the need for the Corps to evaluate and disclose to the public the impact that losing 574 acres of wetlands would have on the environment.

Undoubtedly, when impacts to wetlands are reasonably foreseeable, the Corps must analyze those impacts for significance in its EA. 42 U.S.C. § 4332(C). The Corps recognized this duty, and consonant with it, spent more time in the CDD describing and calculating the cumulative impacts to wetlands, than to any other resource. A.R. 528–29, ¶ 3.2.1; 539–42, ¶ 4.4. The Corps argues that its consideration of the cumulative impacts to wetlands along with the mandatory mitigation measures imposed by GP 98–08 that would purportedly bring the net wetland loss to only seven acres per year support the FONSI with regard to wetlands.

The Corps acknowledges in the CDD the importance and value of the nation's wetlands and describes the various functions they serve, from providing habitat for wildlife to recharging groundwater. A.R. 528. GP 98–08 imposes criteria on its use to limit the adverse effect on wetlands. For example, most dredge and fill activities are limited to .30 acre, with the exception of road crossings, which are limited to .10 acre. GP 98–08, Appx. A, A.R. 529; 573 ("Authorized Activities"). The Corps also recognizes its own limitations in developing criteria to measure the adverse effect of a general permit on wetlands. A.R.

---

d. Areas within 1 mile of an active bald eagle nest site.

e. Riparian wetland areas from 6,000 to 11,000 feet msl in the Medicine Bow Mountains, Wind River Range, Gros Ventre Range, Absaroka Range, and Bighorn Mountains.

f. All of northwestern Wyoming west of U.S. Highways 120 and 789; and north of the 9th Standard Parallel North, excluding the Wind River Indian Reservation.

g. All areas in the Platte River and Green River basins when the activity would cause new water depletions or allow the continuation of historic water depletions. Water depletions include changes in timing of flows, evaporative losses, and consumptive uses.

A.R. 530.

528. Because "no method has yet been approved for use as a standard in permit decisions.... the Corps must continue to rely on acreage, wetland type, and landscape position as a surrogate for defining levels of adverse effect on important functions." *Id.* Indeed, the Corps relied heavily on acreage as an indicator of adverse effect and went on to explain how, based on information obtained from the Wyoming Oil and Gas Conservation Commission, a possible 574 acres of wetlands could be affected as a result of GP 98–08. A.R. 539–42. With the implementation of mitigation measures, however, the Corps estimated that only seven acres of wetlands would be lost each year and concluded that this loss would not be significant.

It has been well established that mitigation measures may be relied upon to make a finding of no significant impact. *Davis v. Mineta*, 302 F.3d at 1125 (citing Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations ("Forty Questions"), 46 Fed.Reg. 18,026, 18,038 (CEQ March 23, 1981)). Though agencies should not rely on the possibility of mitigation as an excuse to avoid preparing an EIS, *id.*, in situations "where the proposal itself so integrates mitigation from the beginning that it is impossible to define the proposal without including the mitigation, the agency may then rely on the mitigation measures in determining that the overall effects would not be significant." Forty Questions, 46 Fed.Reg. at 18,038.

The Corps, in issuing GP 98–08, seemed to assume that the impact of losing the projected 574 acres of wetlands would be a significant impact. The Corps relied on the mitigation measures made mandatory by GP 98–08 to conclude that the permit would not cause a significant impact to wetlands. The Corps concluded that after mitigation, the loss of wetland acres would be dramatically reduced from 574 acres to merely seven acres per year. The Corps then determined that the loss of seven acres per year was not significant and issued a FONSI.

■ The Corps' finding that a loss of seven acres per year does not constitute a significant impact was not, in and of itself, arbitrary and capricious. The Court is not convinced that more analysis is needed to determine the effect on wetlands. It would be an unnecessary expenditure of time and energy to discuss the impact that the loss of 574 acres of wetlands would have when, after mitigation, the Corps projects that only 35 acres will be lost over a five year period. *See Holy Cross*, 960 F.2d at 1527 ("When the Corps determined that there would be no adverse impacts on wetlands, and developed a plan to ensure that result, the need for publication of studies relating to possible effects on wetlands disappeared."). If, however, the Corps' reliance on mitigation measures was not justified, the Court can only assume that the impacts to wetlands without the mitigation measures would result in significant impacts, and the issuance of a FONSI was inappropriate. It is to the Corps' reliance on mitigation measures that the Court now turns.

### 3. Reliance on Mitigation

The wetland mitigation measures imposed by GP 98–08 are: (1) that "all wetlands that are temporarily filled (less than 90 days) must be restored" and (2) that "projects that permanently fill more than .25 acre of wetland for all activities combined must be designed to restore or create similar wetland (in-kind) elsewhere, preferably near the project area (on-site), at a minimum replacement ratio of 1:1 for all wetland areas that are permanently filled." GP 98–08, Appx. B, A.R. 576 ("Special Conditions"). The Corps assumed, based on these mitigation mea-

sures that temporary impacts to wetlands would be fully restored and that 90% of permanently filled wetlands would be replaced. This led the Corps to its conclusion that only seven acres of wetlands would be lost per year, and its finding of no significant impact.[7]

■ As discussed previously, mitigation measures can form the basis of a finding of no significant impact. *Davis v. Mineta*, 302 F.3d at 1125. Those mitigation measures, however, must meet some minimal standards. First, the mitigation measures must be more than a possibility. *Id.* They must be imposed by statute or regulation or have been so integrated into the initial proposal that it is impossible to define the proposal without the mitigation. *Id.;* Forty Questions, 46 Fed.Reg. at 18,-038. In this case, the mitigation measures are a mandatory condition to the use of GP 98–08. As such, they qualify as the type of mitigation measures that can be relied upon for a finding of no significant impact. *See Davis v. Mineta*, 302 F.3d. at 1125 (overturning the finding of no significant impact because "the [EA] makes no firm commitment to any noise mitigation measures").

Second, the mitigation measures relied upon must " 'constitute an adequate buffer' ... so as to 'render such impacts so minor as to not warrant an EIS.' " *Greater Yellowstone Coalition*, 359 F.3d at 1276 (quoting *Wetlands Action Network*, 222 F.3d 1105, 1121 (9th Cir.2000)). In other words, "When the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce

environmental impacts below the level of significance that would require an EIS." *National Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2d Cir.1997). "In practice, mitigation measures have been found to be sufficiently supported when based on studies conducted by the agency, ... or when they are likely to be adequately policed." *Id.* (citations omitted). In *Greater Yellowstone Coalition*, the Tenth Circuit found the mitigation measures to be sufficient. 359 F.3d at 1276. The mitigation measures, designed to protect bald eagles, were incorporated into a project to build a golf course near Jackson Hole, Wyoming. *Id.* The measures included daily monitoring of active eagle nests during the construction process and monitoring for five years following construction. *Id.* Due in part to the difficulty in predicting eagle reactions to the construction process (a Biological Assessment and Biological Opinion had been conducted by the FWS on the impact of the project to bald eagles), the Tenth Circuit held that the monitoring measures were sufficient to "constitute an adequate buffer." *Id.*

In *Wetlands Action Network*, the decision on which the Tenth Circuit relied in *Greater Yellowstone Coalition*, the Ninth Circuit held that the Corps did not act arbitrarily or capriciously in issuing a FONSI based on mitigation measures. 222 F.3d at 1121–22. The court noted,

A careful review of the record demonstrates that mitigation measures were developed to a reasonable degree and had been reviewed by the Corps and other federal agencies at the time the permit issued. Moreover, the special

---

7. According to the calculations performed by the Court, based on the Corps' prediction that only two thirds of the 574 acres of fill would be permanent and that 90% of the permanently filled wetlands would be replaced, closer to eight acres, rather than seven as the Corps predicted, of wetlands would be lost per year.

Though probably only an inadvertent error on the part of the Corps, the mistake gives the Court reason to wonder whether other calculations made by the Corps with respect to the number of wetland acres impacted are accurate.

conditions included in the permit and reviewed by the various agencies were *extremely* detailed. Thus, *the Corps could determine the precise nature of many of the mitigation measures* at the time that it made the permitting decision.

*Id.* at 1121 (emphasis added).

Compare the decision in *Wetlands Action Network* to the Ninth Circuit's conclusion in *National Parks and Conservation Association v. Babbitt*, another case cited by the Tenth Circuit in *Greater Yellowstone Coalition.* In *National Parks*, the Ninth Circuit noted that a "perfunctory description" or a " 'mere listing' of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact." 241 F.3d 722, 734 (9th Cir.2001) (citing *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir.2000)). *See also Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir.1999). The court held that "[t]here is a paucity of analytic data to support the Parks Service's conclusion that the mitigation measures would be adequate .... [T]he Parks Service did not conduct a study of the anticipated effects of the mitigation measures nor did it provide criteria for ongoing examination of them or for taking any needed corrective action ...." *Id.* The Ninth Circuit concluded that "[t]he EA's

speculative and conclusory statements are insufficient to demonstrate that the mitigation measures would render the environmental impacts so minor as to not warrant an EIS." *Id.* at 735; *see also O'Reilly v. U.S. Army Corps of Engineers*, 2004 WL 1794531, *5 (E.D.La.2004) ("The discretion afforded the Corps under the law to make the mitigation determination in the first instance does not mean that a decision is unimpeachable simply because the Corps has reached a particular conclusion. The Corps must provide enough analysis and data so that a reviewing court can insure that the Corps has complied with NEPA. In short, the Corps' failure to employ any analysis or gather any data with respect to its mitigated FONSI rendered its decision arbitrary and capricious.").

■■■ The Court likens the mitigation measures imposed by GP 98–08 to those described in *National Parks.* Rather than being detailed and justified by some evidence in the record that would support their efficacy, the mitigation measures mandated by GP 98–08 are vague and speculative. The Corps fails to point to a shred of scientific evidence in the record to demonstrate that wetland replacement is a successful mitigation measure. Nor could this Court, after a review of the record, find any such statement.[8] In fact, the only assurance the Corps can give the Court

---

8. The record is replete with comments from individuals who question whether the mitigation measures will be successful. *See* A.R. 292, 305, 311, 319, 324. Comments submitted on behalf the United States Fish and Wildlife Service ("FWS") contradict the Corps' conclusion that the mandatory wetland replacement mitigation will be as successful as the Corps predicts. The FWS wrote, "[T]he proposed mitigation requirements are not sufficient to ensure that mitigation wetlands fully replace lost wetland acres and values in-kind. The requirements for in-kind and concurrent mitigation are excellent. However, we believe additional success criteria and monitor-

ing requirement are necessary to ensure full wetland replacement." A.R. 370. FWS was also concerned that the mitigation measures were less stringent than those proposed for GP 97–01 in which impacts to "all wetlands filled—not just wetland impacts greater than .33 acres," would be offset by replacement. *Id.* The comments submitted by WOC also call into question the efficacy of the mitigation measures and rely on several scientific studies. A .R. 228–29. In the face of such concerns, it is difficult for this Court to see how the Corps' reliance on mitigation is supported by substantial evidence in the record.

that the mitigation measures will be successful is the conclusory nature of the mitigation measures themselves, which mandate that wetlands temporarily filled be restored and wetlands permanently filled be replaced at a 1:1 ratio. This Court cannot rely solely on a permit condition that mandates a 1:1 replacement ratio when no other evidence supports a finding that such a ratio is even possible. The Corps itself concludes in the CDD that the 1:1 replacement ratio mandated in the permit will only be 90% effective. How the Corps arrived at such a conclusion this Court can only guess, as the record is devoid of any information whatsoever that would support the efficacy of wetland replacement mitigation.

Neither is the Court convinced that the Corps' monitoring of actual wetland effects, A.R. 542, will provide the necessary safeguard to confirm its predictions as to efficacy of the mitigation measures. The Corps has set forth no specific plan for monitoring and has even acknowledged in the CDD that it "has done a poor job of tracking past impacts on both wetlands and other waters primarily due to a lack of notification for numerous activities and 'generic' permits that do not distinguish the type of project." A.R. 539. In addition, the permit conditions with regard to monitoring state only that "[a]nnual monitoring reports *may* be required to document mitigation results." GP 98–08, Appx. B, A.R. 576 ("Special Conditions") (emphasis added). This is not the kind of adequate policing that would make a mandatory mitigation measure sufficient to support a FONSI. *National Audubon Soc.*, 132 F.3d at 17.

In short, the mitigation measures relied upon by the Corps, while mandatory, are

not supported by a single scientific study, paper, or even a comment. This Court does not expect the Corps to conduct extensive research on the efficacy of wetland replacement. Neither can the Court defer to the Corps' bald assertions that mitigation will be successful. A grand generalization that a 1:1 replacement ratio will be 90% effective is not supported by any, let alone substantial, evidence in the record. As such, the Corps was arbitrary and capricious in relying on mitigation to conclude that there would be no significant impact to wetlands.[9] The Court remands to the Corps to support its reliance on mitigation.

## II. CWA Claim

WOC challenges the issuance of GP 98–08, arguing that the Corps violated the CWA in finding that the adverse effects of GP 98–08 on the environment would be minimal. In addition, WOC argues that the Corps' conclusion that the activities authorized under GP 98–08 are both similar in nature and similar in impact was arbitrary and capricious.

### 1. Statutory and Regulatory Background

The Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, is a comprehensive statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To this end, the CWA prohibits the discharge of any pollutant, which includes dredged or fill material, *id.* § 1362(6), into navigable waters unless authorized by a CWA permit. *Id.* § 1311. Navigable waters is defined as "waters of the United States", *id.* § 1362(7), which in turn is

---

**9.** The Court notes that even if there were evidence to show that mitigation measures would successfully reduce the number of affected wetland acres to seven per year, it would not ameliorate concerns that GP 98–08 may have significant adverse effects on resources other than wetlands.

defined by regulation to include certain wetlands. 33 C.F.R. §§ 328.3(a), (b).

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into navigable waters through the issuance of permits. 33 U.S.C. § 1344. The Corps may issue either individual permits on a case-by-case basis, or general permits for "categories of activities" on a state, regional, or nationwide basis. *Id.* §§ 1344(a), (e). Section 404(b)(1) of the CWA requires the Environmental Protection Agency ("EPA"), in conjunction with the Corps, to promulgate guidelines governing the issuance of permits under § 404. *Id.* § 1344(b)(1). These guidelines are codified at 40 C.F.R. Part 230. Pursuant to guideline requirements, when issuing a general permit, the Corps performs an analysis of the probable effects of a proposed discharge upon the aquatic ecosystem. *See, e.g.,* 40 C.F.R. §§ 230.6(d), 230.10. According to the guidelines, the Corps can issue a general permit only where the activities being authorized by the permit are similar both in nature and in impact. In addition, the activities must result in only minimal individual and cumulative adverse effects on the environment. 33 U.S.C. § 1344(e)(1); 40 C.F.R. § 230.7(a). Thus, prior to issuing a general permit, the Corps must prepare an evaluation that "include[s] a precise description of the activities to be permitted ... explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single General Permit." 40 C.F.R. § 230.7(b)(2). The Corps must also document the "potential short-term or long-term effects"

and predict the cumulative impacts of the permitted activities by estimating the "number of individual discharge activities likely to be regulated under the general permit." *Id.* §§ 230.11, 230.7(b)(3). No further analysis is required when activities are initiated pursuant to a general permit. *Id.* § 230.6(d).

In addition to the guidelines, the Corps also applies the "public interest review" criteria of its own regulations, under which the Corps evaluates a proposed activity's probable impacts as well as its reasonably expected benefits. 33 C.F.R. § 320.4(a)(1). "The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process."[10] *Id.*

In administering the § 404 program, the Corps attempts to avoid unnecessary regulatory controls. The Corps' regulations specifically state, "The Corps believes that state and federal regulatory programs should complement rather than duplicate one another. The Corps uses general permits ... to reduce duplication." 33 C.F.R. § 320.1(a)(5). Thus, the Corps can issue general permits, as opposed to individual permits, to streamline the § 404 permitting process.

> The term "general permit" is defined as: [a permit] that is issued on a nationwide or regional basis for a category or categories of activities when:
>
> (1) Those activities are substantially similar in nature and cause only minimal individual and cumulative environmental impacts; or

**10.** While the Corps is the permitting authority under CWA § 404, EPA often comments on proposed Corps permits. EPA's comments are not binding on the Corps, and the Corps may issue a permit notwithstanding EPA's adverse comments, or deny a permit notwithstanding EPA's lack of objections. Neverthe-

less, § 404(c) authorizes EPA to prohibit the issuance of a § 404 discharge permit, or to restrict the conditions under which the Corps may authorize an activity, if it makes certain findings about the effects of the proposed discharge. EPA has not exercised this authority with respect to GP 98–08.

(2) The general permit would result in avoiding unnecessary duplication of the regulatory authority exercised by another Federal, state, or local agency provided it has been determined that the environmental consequences of the action are individually and cumulatively minimal.

33 C.F.R. § 322.2(f)(1)(2). The general permit program "is the primary method of eliminating unnecessary federal control over activities which do not justify individual control or which are adequately regulated by another agency." *Id.* § 320.1(a)(3). The Corps believes that the general permit program fulfills "Congress' desire to ease the impact of the section 404 program upon the public and the Corps by 'eliminating the delays and administrative burdens associated with' unnecessary review of those activities." Resp. Br. at 4 (quoting S.Rep. No. 370, 95th Cong., 1st Sess. at 74, 80 (1977)).

Section 401 of the CWA requires an applicant for a federal permit to conduct any activity which may result in a discharge to obtain a certification from the relevant state that the discharge will comply with several CWA requirements, including the requirement that the discharge meet state water quality standards. 33 U.S.C. § 1341(a)(1); *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 712–13, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). If the relevant state provides the certification subject to conditions, those conditions automatically become conditions of the federal permit. 33 U.S.C. § 1341(d). With respect to the

activities authorized under GP 98–08, Wyoming has issued a § 401 certification. As such, Wyoming's water quality certification is considered conclusive regarding water quality considerations unless EPA advises of water quality impacts to be taken into account. 33 C.F.R. § 320.4(d).

### 2. *Minimal Impacts*

■ Before the Corps can issue a general permit, the CWA and its implementing regulations require the Corps to make a finding that the permit will have minimal effects on the environment, when considered both individually and cumulatively. 33 U.S.C. § 1344(e)(1); 40 C.F.R. § 230.7(a). Unlike NEPA, which imposes only procedural requirements, the CWA imposes "substantive restrictions on agency action." *Greater Yellowstone Coalition*, 359 F.3d at 1273–74. Whereas NEPA "does not mandate particular results," *Custer County*, 256 F.3d at 1034, the CWA is clear that when the effect of a general permit will be more than minimal, either individually or cumulatively, the Corps cannot issue the permit. 33 U.S.C. § 1344(e)(1); 40 C.F.R. § 230.7(a).

The § 404 guidelines more specifically require the Corps to determine whether "[t]he activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment." [11] 40 C.F.R. § 230.7(a)(3). The "aquatic environment" is defined by the guidelines as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communi-

---

11. The CWA and § 404 guidelines seem to diverge on the standard for evaluation of cumulative impacts. The CWA § 404 requires the Corps to determine whether the activities authorized by the general permit "will have only minimal cumulative adverse effect on *the environment.*" 33 U.S.C. § 1344(e). The guidelines, however, are more specific, requiring only that the cumulative effect on

"water quality and the aquatic environment" be minimal. 40 C.F.R. § 230.7(a)(3). This Court could find no case that addressed this discrepancy or how the standard should be applied. Nor will the Court address it here, as it finds that even under the arguably narrower § 404 guidelines standard, the Corps failed to make a finding of minimal cumulative effect on the "aquatic environment."

ties and populations of plants and animals." *Id.* § 230.3(c). The guidelines further define "waters of the United States" as "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, . . . [a]ll interstate waters including interstate wetlands, . . . [and][a]ll other waters . . . which could affect interstate or foreign commerce . . . ." *Id.* § 230.3(s). As the definitions demonstrate, the aquatic environment encompasses more than just wetlands.

The guidelines describe cumulative effects to the aquatic environment as those "changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." *Id.* § 230.12(g)(1). In performing its minimal effects analysis, "Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem." *Id.* § 230.11(g)(2). Finally, the guidelines require that secondary effects, or those effects "that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material," be considered before issuing a general permit. *Id.* § 230.11(h)(1).

In addition to considering cumulative effects on the aquatic environment for the purpose of performing a minimal effects analysis, the Corps must consider the cumulative effect of the general permit on the various public interest factors. 33 C.F.R. § 320.4(a)(1) ("All factors which may be relevant to the proposal must be considered including the cumulative effects thereof . . . .").[12] Once the Corps has considered the effects, including cumulative effects, on the public interest factors, it balances the "benefits which reasonably may be expected to accrue" with the "reasonably foreseeable detriments." *Id.* "[A] permit will be granted unless the district engineer determines that it would be contrary to the public interest." *Id.* Nothing in the public interest review requirements, however, indicates that the assessment of cumulative impacts to the public interest factors plays any role in the minimal effects analysis performed under § 404(e) and the guidelines. According to the guidelines, the Corps need only consider cumulative effects on water quality and the aquatic environment.[13]

WOC argues that the Corps' finding that the impacts of GP 98–08 are cumulatively minimal is not supported by substantial evidence in the record. According to WOC, the Corps failed to consider cumulative effects to non-wetland aquatic resources, as well as downstream effects to water flows, ranchlands, and threatened and endangered species. The failure of

12. The public interest factors that must be weighed are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, consideration of property ownership and, in general, the needs and welfare of the people. 33 C.F.R. § 320.4(a)(1). The weight given to

each factor in the balancing process varies with its "importance and relevance to the particular proposal." *Id.* § 320.4(a)(3).

13. Undoubtedly, there is some overlap between what is considered the "aquatic environment" and the public interest factors, which include wetlands, fish and wildlife values, flood hazards, navigation, shore erosion, water supply and conservation, and water quality. *See* 40 C.F.R. § 230.3(c); 33 C.F.R. § 320.4(a)(1).

the Corps to consider these impacts, WOC argues, renders the Corps' conclusion that the environmental effects of GP 98–08 will be minimal arbitrary and capricious.

The Corps contends that it considered the potential effects of GP 98–08 on wetlands, water quality, and aquatic resources under both public interest review requirements and the guidelines, finding that based on the mandatory mitigation measures and the WDEQ § 401 certification, GP 98–08 would have only minimal effects on those resources. The Corps also points out that cumulative effects need only be "predicted to the extent reasonable and practical." 40 C.F.R. § 230.11(g)(2). The Corps concludes that it performed a "reasonable and practical" analysis of cumulative effects.

■ The Corps' finding that the cumulative effects of GP 98–08 will be minimal fails for two reasons. First, the Corps admittedly relied on mitigation measures that are unsupported by substantial evidence in the record, as discussed above, to find that the effects of the permit would be minimal. Second, the Corps failed to evaluate the cumulative effect of GP 98–08 on non-wetland aquatic environments, particularly those downstream waters that might feel the secondary effects of GP 98–08.[14] As such, the Corps' conclusion that the effects of GP 98–08 are minimal is arbitrary and capricious.

The CDD begins and ends its discussion of cumulative effects with wetlands. A.R. 539–42. In the portion of the CDD specifically designated for compliance with the guidelines, the Corps first addresses whether the activities permitted are similar in nature and similar in impacts. A.R. 536–37, ¶ 4.2. Next, the Corps evaluates the individual adverse effects of GP 98–08

and determines they will be minimal. A.R. 537–38, ¶ 4.3. Finally, the Corps discusses cumulative effects. A.R. 539–42, ¶ 4.4. The cumulative effects section describes in detail the manner in which the Corps arrives at the conclusion that 574 acres of wetlands could potentially be affected by GP 98–08, based on data garnered from the Wyoming Oil and Gas Conservation Commission. *Id.* The section ends with the conclusion that only seven acres per year of wetlands will be filled if the mitigation is successful. A.R. 542. The Corps impliedly concludes that the cumulative effects will be minimal.

The guidelines require the Corps to consider more than just cumulative effects on wetlands. The Corps must consider cumulative adverse effects to the aquatic environment, 40 C.F.R. § 230.7(a)(3), which includes wetlands, *id.* § 230.3(c). The Corps argues that it considered impacts to non-wetland aquatic resources under the public interest review requirements. The Corps did discuss potential impacts to fish and wildlife, A.R. 529–30, floodplain management, A.R. 532, and water supply and conservation, A.R. 533, in the course of its public interest review. At the conclusion of its review of the public interest factors, however, the Corps states, "Reliable information is not available to properly assess potential *cumulative effects* on all the various public interest factors." A.R. 535, ¶ 3.3.4 (emphasis added). In short, the Corps failed to consider the cumulative effects on any aquatic resource other than wetlands, in violation of the guidelines, 40 C.F.R. § 230.7(a)(3), and § 404(e), which requires that general permits be issued when they will "have only minimal cumulative adverse effect on the environment," 33 U.S.C. § 1344(e)(1).

---

14. The § 404 guidelines also require the Corps to determine whether the cumulative effects on water quality are more than minimal. 40 C.F.R. § 230.7(a)(3). This require-

ment was met by the WDEQ § 401 certification, which is conclusive as to water quality concerns. 33 C.F.R. § 320.4(d).

The Corps argues, based on 40 C.F.R. § 230.11(g)(2), which states, "Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical," that its analysis of cumulative effects was sufficient. However, 40 C.F.R. § 230.11(g)(2) goes on to say, "The permitting authority *shall* collect information and solicit information from other sources about the cumulative impact on the aquatic ecosystem. This information *shall* be documented and considered during the decision making process concerning the evaluation of ... the issuance of a General permit ...." *Id.* (emphasis added). The Corps did not collect and solicit information on the cumulative effect of GP 98–08 on any part of the aquatic ecosystem other than wetlands, nor did it document and consider the cumulative effect on non-wetland aquatic resources in making its decision. Instead, it concluded that "reliable information is not available." A.R. 535.

The Corps failed to consider the cumulative effect of GP 98–08 on non-wetland aquatic environments in its minimal effects analysis under the CWA. As such, the Court remands to the Corps for consideration of those impacts.

### 3. *Similarity*

In addition to requiring the Corps to determine that the individual and cumulative effects of a general permit are minimal, the CWA requires the Corps to determine that impacts of the permit are both similar in nature, 33 U.S.C. § 1344(e)(1), and similar in impact, 40 C.F.R. § 230.7(a)(1). WOC challenges the Corps' finding on both counts. The Court will first consider whether the Corps was arbitrary and capricious in determining that the impacts of GP 98–08 were similar in nature.

### a. Similar in Nature

As a prerequisite to issuing a general permit under the CWA, the Corps must determine that the "activities in such category are similar in nature." 33 U.S.C. § 1344(e)(1). The CWA does not define the term "similar in nature." *Alaska Center for the Environment v. West,* 157 F.3d 680, 683 (9th Cir.1998). The Corps, in applying its similar in nature analysis reasoned, "The regulations allow for development of general permits for 'categories' of activities not just singular activities. Therefore, the activities [sic] purpose is a more important factor to consider in determining if a category of activities is similar in nature than the physical aspects. In this case, the project purpose is narrowly defined as oil and gas production in Wyoming and the category of activities includes only those activities that support the project purpose." A.R. 536, ¶ 4.2. The Corps concluded that the activities permitted by GP 98–08 were similar in nature.

WOC contends that the Corps' interpretation is not entitled to deference and that the activities authorized by GP 98–08— surveys, roads, well pads, utilities, reservoirs, erosion control, hazardous waste cleanup, and mitigation—are not similar in nature. Administrative interpretation of a statute is afforded greater deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and ... the agency interpretation claiming deference was promulgated in the exercise of that authority." *U.S. v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). This kind of deference is called *Chevron* deference and an agency interpretation meriting *Chevron* deference is upheld if it is a "permissible construction of the statute." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An agency interpre-

tation not warranting *Chevron* deference is upheld if it has the "power to persuade." *Mead,* 533 U.S. at 228, 121 S.Ct. 2164 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

■■■ Generally, only formal interpretations by an agency are entitled to *Chevron* deference. "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Mead,* 533 U.S. at 230, 121 S.Ct. 2164. With rare exception, only those interpretations arising from notice-and-comment rulemaking or formal adjudication are afforded *Chevron* deference. *Id.* at 231, 121 S.Ct. 2164; *Southern Utah Wilderness Alliance v. Dabney,* 222 F.3d 819, 828 (10th Cir.2000). The rare exception only applies where Congress intended the type of ruling made by the agency to be afforded deference. *See Mead,* 533 U.S. at 231, 121 S.Ct. 2164. The Corps' interpretation does not arise out of formal notice-and-comment rulemaking, nor did Congress express an intent in the CWA that a definition, as articulated by the Corps and applied in a single EA, without public comment, would be afforded deference. As such, the Corps' interpretation does not qualify for *Chevron* deference and can only be upheld if it has the "power to persuade." *Id.* at 228, 121 S.Ct. 2164.

In support of its interpretation, the Corps asserts that the CWA does not require the activities authorized to be identical in nature. The Corps claims that the activities permitted are all narrowly tied to oil and gas development in Wyoming. Further, if the Corps had so desired, it could have permitted the various activities using separate general permits, *i.e.,* a gen-

eral permit to allow road construction, a general permit to allow reservoirs, and so on. The Corps made a reasoned choice, however, to combine all the activities under one general permit, in keeping with the statutory and regulatory purpose of general permits, to avoid unnecessary duplication of regulatory controls. 33 C.F.R. § 322.2(f)(2). The Corps finally argues that while the CWA does not expressly designate "purpose" as the means by which activities can be considered similar in nature, neither does the statute expressly prohibit the consideration of purpose in determining whether "categories" of activities are similar in nature.

■■■ The Court finds the Corps' interpretation to be sufficiently persuasive and is not prepared to disturb it. After extensive research, only one case emerged that addresses the similar in nature requirement. *Alaska Center for the Environment v. West,* 157 F.3d 680, 683 (9th Cir.1998). In *Alaska Center for the Environment,* the Corps had proposed to issue five general permits that authorized five different categories of activities—residential fill pads; roads; commercial, institutional, and community development; industrial development; and wetlands, habitat, and water quality enhancement projects. *Id.* at 681. The Alaska Center for the Environment objected, claiming the activities authorized under each permit were not similar in nature. *Id.* at 682. The Ninth Circuit characterized the issue as follows: "whether the Corps may issue a general permit to include such a range of activities it considers similar in nature, or whether the permit may only authorize a narrowly defined activity." *Id.* at 683. The court concluded that the Corps' conclusion was neither plainly erroneous or inconsistent with the regulations.[15] *Id.* at 684. The court reasoned,

---

15. The standard of review employed by the Ninth Circuit in *Alaska Center for the Environ-*

*ment* was whether the Corps' interpretation

While it may be true that the regulations do not specifically distinguish between such structures as "single family housing" and "two-family dwellings," we are not persuaded that the general permitting process must necessarily require such fine distinctions. In terms of permitting for commercial uses, such distinctions would appear to blur the line between specific and general permits, rendering general permits virtually unavailable for commercial development.

*Id.*

In terms of GP 98–08, the Court finds that requiring the Corps to permit the various activities associated with oil and gas development with separate general permits would defeat one of the purposes of the general permitting process, to reduce duplication, 33 C.F.R. § 320.1(a)(5). Further, the activities associated with oil and gas development can be characterized in a myriad of ways. Activities could be categorized based on the type of mineral being extracted, the size of the various projects, the physical characteristics of the project, the location of the development, or the desired purpose of the project. The Court cannot find that the Corps was arbitrary in relying on purpose to categorize the activities authorized by GP 98–08. To require the Corps to differentiate the activities based on all possible criteria would "would appear to blur the line between specific and general permits, rendering general permits virtually unavailable for [oil and gas] development." *Id.* The Corps' finding that the activities authorized were similar in nature was not arbitrary and capricious.

b. Similar in Impact

WOC's final argument is that the Corps' conclusion that the impacts of GP 98–08 will be similar is arbitrary and capricious. According to WOC, GP 98–08 expressly authorizes activities that cause different impacts. For example, while most activities are prohibited from interfering with the spawning season, dams and reservoirs are not. In addition, permanent as well as temporary impacts are authorized. Finally, the Corps does not distinguish between impacts in different geographical regions of Wyoming, where impacts might be different due to variances in the local ecosystems. The Corps argues that the permit conditions, which place limits on the amount of acreage that can be affected, render the impacts of the authorized activities under GP 98–08 similar.

The § 404 guidelines require that activities authorized by a general permit be both similar in nature *and* similar in impact. 40 C.F.R. § 230.7(a)(1). The guidelines also point out that "[a]ctivities otherwise similar in nature may differ in environmental impact due to their location ...." 40 C.F.R. § 230.7(b)(2). Permit conditions, however, can render otherwise dissimilar impacts, similar. *Alaska Center for the Environment,* 157 F.3d at 683. In *Alaska Center for the Environment,* the Ninth Circuit noted the Corps' argument that "the proposed GP's are de-

was plainly erroneous or inconsistent with the regulations. 157 F.3d at 684. This more lenient standard came from the court's assumption that the Corps was not interpreting the language of the CWA, but rather, the language of its own regulations. *Id.* The CWA, 33 U.S.C. § 1344(e)(1), the § 404 guidelines, 40 C.F.R. § 230.7(a)(1), and the Corps' regulations, 33 C.F.R. § 322.2(f)(1), all require the authorized activities to be similar in nature.

The Court notes, that the Corps' regulations add nothing to the statutory language. The Corps, in interpreting its own regulations is merely interpreting the statutory language. As such, the Court can afford no greater deference to the Corps' interpretation. Regardless of whether a more lenient standard should apply, the Court concludes that the Corps' interpretation survives the higher standard of persuasiveness, as set forth above.

signed so that secondary impacts that might differentiate the activities proposed for authorization have been reduced such that environmental impacts would not now differ among the GPs." *Id.* The court concluded that "such considerations do not constitute arbitrary and capricious action. The regulations explicitly require the Corps to consider and explain why actions are 'similar . . . in environmental impact.' 40 C.F.R. § 230.7(b). The conditions satisfy this requirement." *Id.*

■ The conditions placed on GP 98–08, like those in *Alaska Center for the Environment,* render the environmental impacts of the various activities similar. Regardless of the type of activity authorized, wetland fill is limited to .30 acre or less. GP 98–08, Appx. A, A.R. 537; 573–74 ("Authorized Activities"). The Corps also imposed other conditions on GP 98–08. GP 98–08, Appx. B, A.R. 575–77 ("Special Conditions"). For example, "All projects must be designed to avoid wetlands and minimize adverse effects on wetlands that cannot be avoided." A.R. 576. "Permittee[s] must comply with all conditions issued in accordance with water quality certifications under Section 401 of the [CWA]." A.R. 575. "Best Management Practices" must be followed by all permittees. *Id.* The Court finds that the Corps' reliance on permit conditions to find that impacts to the environment would be similar is not arbitrary and capricious.

### CONCLUSION

The Court is cognizant of the importance of mineral development to the economy of the State of Wyoming. Nevertheless, mineral resources should be developed responsibly, keeping in mind those other values that are so important to the people of Wyoming, such as preservation of Wyoming's unique natural heritage and lifestyle. The purpose of NEPA and the CWA is to require agencies, such as the Corps, to take notice of these values as an integral part of the decisionmaking process. This Court will not rubberstamp an agency determination that fails to consider cumulative impacts, fails to realistically assess impacts to ranchlands, and relies on unsupported, unmonitored mitigation measures. NEPA and the CWA require more.

In sum, the Court concludes that the Corps was arbitrary and capricious in: (1) failing to consider cumulative impacts to non-wetland resources; (2) failing to consider impacts to private ranchlands in light of the concerns voiced in the record; (3) relying on mitigation measures wholly unsupported by the record with no definite plan for monitoring; and (4) finding for the purposes of the CWA that cumulative effects on the aquatic environment were minimal without assessing cumulative impacts to any resource other than wetlands. The Court remands to the agency for further findings regarding cumulative impacts to non-wetland resources, impacts to private ranchlands, and the efficacy of mitigation measures. The Corps should reassess its issuance of a FONSI in light of these findings.

The Court also concludes that the Corps was not arbitrary and capricious in: (1) its consideration of impacts to water quality; (2) its consideration of threatened and endangered species; (3) its analysis of impacts to wetlands; or (4) in its conclusion that the impacts of GP 98–08 for purposes of the CWA were both similar in nature and similar in impact.

THEREFORE, it is hereby

**ORDERED** that this matter is **REMANDED** to the Corps for further proceedings consistent with this opinion.